SANDERS, Justice.
 

 Crow Drilling & Producing Company, Inc., and James M. Forgotson brought this declaratory judgment action seeking a declaration that they are entitled to 22 %oths of the oil produced from two wells in Rapides and LaSalle Parishes, under their contracts with defendants H. L. Hunt and B. B. Barber as trustee of Reliance Trusts.
 

 The district court held the plaintiffs, Crow and Forgotson, were entitled to 22 •%oths of the production from the wells After a new trial, however, the court decreed plaintiffs to be entitled to 16J4oths of the production from Well No. 1 and to none of the production from Well No. 2. The plaintiffs appealed.
 

 The Court of Appeal reversed in part and declared plaintiffs to be entitled to 22%oths of the production from both wells. La.App., 211 So.2d 128. On application of defendants, we granted certiorari to review the judgment of the Court of Appeal, 252 La. 867, 214 So.2d 544.
 

 Under a farm out agreement, Crow and Forgotson own an oil and gas lease dated November 10, 1958, executed by Eota Realty Company and others as lessors, and called “Eota Lease,” insofar as the lease covers land to certain subsurface depths in Section 26, Township 5 North, Range 3 East. The lease describes a portion of the land as follows:
 

 NE South of Saline Bayou.
 

 B. B. Barber, as trustee of Reliance Trusts, one of the defendants, owns an oil and gas lease dated April 10, 1947, executed by Tensas Delta Hardwood Lumber Company and Delta Hardwood Lumber Company, as lessors, called “Louisiana Delta Lease.” The lease describes the land covered in the same Section 26 as follows:
 

 Acreage
 

 All NE J4 North and East of Saline Bayou 35.00
 

 Barber acquired this lease from H. L. Hunt and, in so doing, assumed Hunt’s rights and obligations under three agreements with Crow relating to drilling and operation of the two disputed wells.
 

 
 *667
 
 The • first of these agreements relates to Well -No. 1 in the -NW
 
 y4
 
 of the NE
 
 i/4
 
 of Section 26, Township 5 North, Range 3 East, Rapides Parish. In letter form, it states:
 

 “October 4, 1963
 

 “Mr. H. L. Hunt
 

 1704 Main Street
 

 Dallas, Texas
 

 “Re: Crow — Gulf Coast Venture Eota — -La. Delta No. 1
 

 “Dear Sir:
 

 “We are writing this letter in the nature of an agreement for the drilling of our jointly owned well located in the NW/4 of the NE/4 of Section 26, T 5 N, R 3 E, Rapides Parish, Louisiana.
 

 “It is agreed that there is presently some difficulty in arriving at the exact amount of acreage in each lease necessary to pool and comprise this 40 acre unit, and therefore, in order to fix the amount of participation for each lease owner, it is hereby agreed that H. L. Hunt will participate in the drilling of this well to the extent of 1714ioths of the working interest and the Crow—
 

 • Gulf Coast interest will participate to the extent of 22j4ioths in the .cost of drilling this well. In the event subsequent information, except the failure of individual titles to leases, should reveal that any party has less interest than the above, it is still hereby agreed that the ownership would be the same and the participation and the expenses would be the same as the percentage outlined above.
 

 “It is also agreed that if the drilling of this well results in a producer that the parties will enter into a joint operating agreement on the familiar Ross-Martin form with the changes as suggested by Hunt regarding individual parties and also with the use of Hunt’s figures on the accounting procedure for overhead items.
 

 “It is also agreed that Crow Drilling & Producing Co. will drill this well under a regular contract for the area at the prevailing price of $2.90 per foot, which includes an amount not to exceed $500.00 for road and location, and includes surface pipe and cement for surface, artificial mud, IES electric log and 24 sidewalls samples and otherwise turnkey this job to point where decision to set pipe is made. For all other work and any completion work, it is agreed that Crow will furnish their rig at a day rate of $650.00 per 24 hour day when drill pipe is in use and $600.00 per 24 hour day when drill pipe is not in use.
 

 “We believe this properly outlines our agreement and if satisfactory with you, please sign in the space provided below
 
 *669
 
 and return two copies of this letter to our office.
 

 “Yours very truly,
 

 “CROW DRILLING & PRODUCING CO.
 

 “By: s/David Crow “David Crow
 

 “Accepted this 16th day of October, 1963
 

 “By: s/George Cunyus, agent
 

 “H. L. Hunt by George Cunyus, Agent.”
 

 Pursuant to his agreement with Hunt, Crow obtained from the Louisiana Department of Conservation a permit to drill Well No. 1 and completed it as a producer on October 16, 1963. Crow then mailed to Hunt and Hunt executed the following agreement for the drilling of Well No. 2 in the NE 4t of the NE 14 of Section 26, Township 5 North, Range 3 East, LaSalle Parish:
 

 “October 17, 1963
 

 “Mr. H. L. Hunt
 

 1704 Main Street
 

 Dallas, Texas
 

 ■“Re: Crow- — Gulf Coast Venture Eota — La. Delta No. 2
 

 “Dear Sir:
 

 ■“We are writing this letter in the nature ■of an agreement for the drilling of our jointly owned well located in the NE/4 of the NE/4 of Section 26, T 5 N. R 3 E, LaSalle Parish, Louisiana.
 

 “We recently entered into an agreement for the drilling of the Eota — La. Delta No. 1 in which we agreed to share the expenses of drilling this well in the proportions of
 
 Wzio
 
 for Hunt and 22}4io for Crow-Gulf Coast Venture, regardless of the actual ownership of these tracts.
 

 “We hereby agree that we will drill this well under the same terms and conditions as the Eota — La. Delta No. 1 and are enclosing an operating agreement covering the operations of both of these wells.
 

 “If it is satisfactory with you to drill the Eota — La. Delta No. 2 under the same terms and conditions as the Eota — La. Delta No. 1, please sign in the space provided below and return two copies of this letter to our office.
 

 “Yours very truly,
 

 “CROW DRILLING & PRODUCING CO.
 

 “By:' s/David Crow “David Crow
 

 “Accepted this 28th day of October 1963 “H. L. Hunt
 

 “By: s/Geórge Cunyus, Agent “George Cunyus, Agent.”'
 

 ' Enclosed with this letter agreement for the second well was a Ross-Martin “Model
 
 *671
 
 Form Operating Agreement,” dated October 17, 1963, covering both wells. After extensive revision, the operating agreement was executed by Hunt on or about October 29, 1963. Except for a provision on “Failure of Title,” the section on “Title Examination, Loss of Leases and Oil and Gas Interests” was stricken from the agreement.
 

 The operating agreement designates Crow as the operator of both wells.
 

 As to the parties’ interests, the agreement provides:
 

 “Exhibit “A” lists all of the parties, and their respective percentage or fractional interests under this agreement. Unless changed by other provisions, all costs and liabilities incurred in operations under this contract shall be borne and paid, and all equipment and material acquired in operations on the Unit Area shall be owned, by the parties as their interests are given in Exhibit “A”. All production of oil and gas from the Unit Area, subject to the payment of lessor’s royalties, shall also be owned by the parties in the same manner.”
 

 Exhibit “A” is blank, but attached to the agreement, immediately following Exhibit “A,” is a page entitled, “Percentage of Participation.” The percentage table allocates Crow %6 of 22%o; Forgotson
 
 1BAe
 
 of
 
 22%o;
 
 and Hunt 17?4o.
 

 Crow completed the second well as a producer on November 13, 1963.
 

 When Placid Oil Company, the oil purchaser, withheld plaintiffs’ production payments because of a question concerning their share of the production, this suit followed.
 

 The production sharing dispute arises from the location of a bayou forming the boundary between the two leases. Plaintiffs’ lease, as we have observed, covers the NE-14
 
 South
 
 of Saline Bayou. The defendant’s lease covers all the NE-J4
 
 North
 
 and
 
 East
 
 of Saline Bayou, specified as 35 acres. An early official governmental township plat shows , Saline Bayou traversing the
 
 N-]A oí
 
 NE-14 of Section 26 in an East-West direction. As shown on this plat, there are approximately 32.5 acres in the
 
 N-i/2
 
 of NE-J4 North of the Bayou and 46.20 acres South of it.
 

 In 1963, Louis J. Daigre, a consulting engineer, made a ground survey in Section 26. His plat, dated September 21, 1963, disclosed a bayou called “Big Saline Bayou” running generally North and South through the NW-4 of NE-4 of Section 26. On this map, Big Saline Bayou traverses no part of the NE-J4 of NE-4 on which Well No. 2 is located. Moreover, only 16.1 acres lies South of the bayou in the NW-14 of the NE-14, where Well No. 1 is located. Because of the shift in the location of the bayou separating the lands covered by the two leases, defendant Barber asserts his acreage has increased and plaintiffs’ has diminished to the extent
 
 *673
 
 plaintiffs are entitled to 16.1 acre interest in the first well’s production, and nothing more.
 

 In rendering judgment for plaintiffs, the Court of Appeal construed the three agreements together and held the parties had fixed their respective shares in the production by contract.
 

 In this Court, defendants assign the following errors:
 

 “(1) The Court of Appeal was in error in construing the letter agreements as applying or relating to the allocation of production, for the letter agreements were applicable solely to the drilling of the wells and the allocation of the costs of drilling, and, ownership of the wells.
 

 “(2)
 
 The Court of Appeal was in error in construing the letter agreements, and, the Operating Agreement together, in the allocation of production, and in giving controlling importance to the “title failure” provisions of the letter agreements.
 

 “(3) The Court of Appeal was in error in holding that by the Operating Agreement the parties agreed to ‘freeze’ their interests, and that the matter was governed by this Court’s decision in the
 
 Monsanto
 
 case, [Monsanto Chemical Co. v. Southern Natural Gas Co., 234 La. 939, 102 So.2d 223 ] supra, and in failing to hold the Order of the Commissioner of Conservation to be controlling.
 

 “(4) The Court of Appeal was in error in failing to consider and pass upon, defendants’ further alternative defense, predicated upon the fact that plaintiffs did not comply, and were incapable of complying with their obligation, since their leasehold rights were subject to a depth limitation.
 

 “(5) Under its own interpretation of the agreements, and particularly the ‘title failure’ provisions thereof, the Court of Appeal was in error in failing to hold that the plaintiffs were not entitled to any production from the No. 2 Well.”
 

 Plaintiffs advance four alternative propositions to the Court:
 

 (1) The parties fixed their respective shares in production by contract.
 

 (2) Defendants cannot attack plaintiffs’ title.
 

 (3) Plaintiffs’ title cannot fail until defendants prove that someone other than plaintiffs has that title.
 

 (4) Defendants have not proved plaintiffs’ title failed.
 

 The primary question is whether the contracts allocate production so as to maintain the shares originally specified, despite the allegation of an acreage variation between the parties. The Court of Appeal held the contracts made such an allocation. We agree.
 

 
 *675
 
 The first letter agreement records the existence of difficulty in establishing the acreage in each lease. It then undertakes to resolve this difficulty by fixing the amount of participation: 17%)ths to Hunt and 22%oths to Crow and his associate.
 

 Although defendants contend the agreement prorates the drilling expenses only, the language of the agreement refutes this contention. The first sentence announces that the well will be jointly owned. The second sentence fixes “the amount of participation for each lease owner.” Finally, a key sentence provides:
 

 “In the event subsequent information, except the failure of individual titles to leases, should reveal that any party has less interest than the above, it is still hereby agreed that the ownership would . be the same and the participation and the expenses would be the same as the percentage outlined above.”
 

 Defendants assert that the word
 
 participation
 
 in this key sentence refers only to a sharing of the well-drilling expenses. We reject this construction. In context,
 
 participation
 
 is unrestricted. Moreover, it is found in the word sequence
 
 participation and the expenses,
 
 the conjunction indicating the term has a meaning other than expenses. We construe
 
 participation
 
 here to mean a sharing in production.
 

 The key sentence also includes the word
 
 ownership.
 
 Defendants would restrict the ownership of an oil well to a proprietary interest in the well casing and tubing. Such a restrictive application is in our opinion unwarranted. In ordinary usage, ownership of an oil well also includes rights to the production.
 

 In oral argument, counsel referred to the agreement as a “shade tree agreement.” An oil operator prepared it without the assistance of legal counsel. Although the agreement is inartistically phrased, the embodied intention seems clear. The agreement allocates production between the parties. This allocation is subject to revision only in one instance: the failure of individual titles to leases.
 

 The second letter agreement denominates Well No. 2 as jointly owned and incorporates by reference the terms and conditions of the first agreement.
 

 The drastically revised operating agreement continues the same participation or shares of production. It also contains the following provisions concerning failure of title:
 

 “Should any oil and gas lease, or interest therein, be lost through failure of title, this agreement shall, nevertheless, continue in force as to all remaining leases and interests, and
 

 “(1) The party whose lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be entitled to recover from Op
 
 *677
 
 erator or the other parties any development or operating costs which it may have theretofore paid, but there shall be no monetary liability on its part to the other parties hereto by reason of such title failure; and
 

 “(2) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Unit Area by the amount of the interest lost; and
 

 “(3) If the proportionate interests of the other parties hereto in any producing well theretofore drilled on the Unit Area is increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such interests (less operating costs attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well; and
 

 “(4) Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has failed, pay in any manner any part of the cost of operation, development, or equipment, or equipment previously paid under this agreement, such amount shall be proportionately paid to the party or parties hereto who in the first instance paid the costs which are so refunded; and
 

 “(5) Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be borne by the parties in the same proportions in which they shared in such prior production.”
 

 Defendants assert the operating agreement supersedes the letter agreements; hence, the court is restricted to the four corners of the drastically revised Ross-Martin form in determining whether production must be reallocated because of title failure. But, in any event, defendants assert plaintiffs’ title has failed because subsequent information has disclosed their lease covers a smaller acreage, and defendant’s lease covers all the land on which Well No. 2 was drilled.
 

 . What is obviously contended is that the operating agreement is a novation of the letter agreements and a new obligation has been substituted for the old one. See LSA-C.C. Arts. 2188, 2189.
 

 Article 2190, LSA-C.C., provides that a novation is never presumed and the intention to make it must be clearly shown by the terms of the instrument.
 

 
 *679
 
 The operating agreement contains no terms dearly reflecting an intent to make a novation. Moreover, whatever clues appear in the circumstances surrounding the execution of the operating agreement show the parties intended the letter agreements to persist after execution of the operating agreement. Hence, we conclude, as did the Court of Appeal, that the three agreements must be construed together to determine whether production should be reallocated. LSA-C.C. Art. 1949.
 

 As we have already observed, the first agreement contained only one exception that would disturb the allocation of production: “the failure of individual titles to leases.” The exception obviously does not refer to a discovery that one party’s lease covers less acreage because the other party’s adjoining lease covers more. This was the identical problem the parties recognized and undertook to solve in the contract. Each party contributed all the acreage covered by his lease. The contracting parties agreed to set at rest the question of acreage variation as between their leases. To construe the exception to require a reallocation of production in this situation would render a major portion of the contract meaningless.
 

 We construe the exception so as to give effect to all clauses of the contract. See LSA-C.C. Arts. 1945, 1951, 1955; Noel Estate v. Kansas City Southern & Gulf Ry. Co., 187 La. 717, 175 So. 468. It means title divestitures by which third parties intrude into lease ownership. In the absence of such a divestiture, the production shares of the parties remain as originally specified, though subsequent information “should reveal that any party has less interest than the above. * * * ”
 

 Having construed the letter agreements to permit no change in plaintiffs’ share of production, we observe a continuation of the intention pattern in the operating agreement. The operating agreement fixes the “percentage of participation” as specified in the previous letter agreements. The parties struck out that part of the form agreement relating to title examination. The failure of title provision was retained obviously to acccommodate a divestiture of a lease title in favor of a third party in accordance with the exception in the letter agreements. The parties contemplated no acreage adjustment between themselves, because the percentage of participation was fixed without regard to the “exact amount of acreage in each lease.”
 

 If, however, the intent of the parties be considered doubtful, the construction put upon the agreement by the parties themselves is one of the most reliable guides.
 

 Article 1956, LSA-C.C. provides:
 

 “When the intent of the parties is doubtful, the construction put upon it, by the manner in which- it has been ex
 
 *681
 
 ecuted by both, or by one with the express or implied assent of the other, furnishes a rule for its interpretation.”
 

 Hunt employees became aware of a possible mislocation of the bayou before the completion of the first Well. They acquired a copy of the Daigre plat on or about October 7, 1963. Despite this information, defendants acquiesced in payment by plaintiffs of 2254oths of the drilling costs and continued to pay only 17%oths of the operating expenses for nearly a year until suit was filed. Thus, the manner of execution reinforces plaintiffs’ construction of the agreement. See Jacka v. Ouachita Parish School Board, 249 La. 223, 186 So.2d 571.
 

 We conclude the contracts allocate production between the parties so as to insulate the respective shares from the effect of the alleged acreage variation in the paired leases. Having reached this conclusion, we find it unnecessary to determine the acreage status of the competing titles. A consideration of these titles is thus pretermitted.
 

 Alternatively, defendants contend the Order of the Louisiana Department of Conservation, dated May 1, 1964, superseded the contractual obligations of the parties and reallocated production.
 

 The conservation order created a 40-acre unit for each of the two wells covered by the operating agreement. We find nothing in the order which conflicts with the contractual division of the working interests.
 

 When the lease owners fix the distribution of production from a well by contract, the distribution is neither altered nor abrogated by such a conservation order. See Monsanto Chemical Co. v. Southern Natural Gas Co., 234 La. 939, 102 So.2d 223; Southwest Gas Producing Co. v. Creslenn Oil Co., La.App., 181 So.2d 63, cert. denied, 248 La. 797, 182 So.2d 74.
 

 The defendants rely upon Humble Oil and Refining Company v. Jones, La.App., 157 So.2d 110. But that decision is factually and legally inapposite.
 

 Finally, defendants contend the existence of a depth limitation in plaintiffs’ lease farmout violates the operating agreement and deprives plaintiffs of standing to maintain this suit. Defendants couch this argument in terms of “default” and “failure of consideration.” An examination of the operating agreement discloses that it is based upon the existing leases. The agreement is subject to the terms and conditions of the basic leases.
 

 It is true the operating agreement refers to the drilling of “any well.” But this obviously refers to a well authorized by the leases upon which the operating agreement is based. The contention is without merit.
 

 
 *683
 
 We conclude, as did the Court of Appeal, that the plaintiffs are entitled to 22%oths from the production of both wells.
 

 For the reasons assigned, the judgment of the Court of Appeal is affirmed at defendants’ costs.