432 So.2d 886 (1983)
CHEVRON U.S.A., INC.
v.
MARTIN EXPLORATION COMPANY, et al.
No. 82 CA 0596.
Court of Appeal of Louisiana, First Circuit.
April 5, 1983.
Rehearing Denied June 10, 1983.
*887 Robert L. Redfearn, John C. Herbert, Simon, Peragine, Smith & Redfearn, New Orleans, for Martin Exploration and Ken G. Martin, third-party defendant, appellant.
John C. Christian, M. Taylor Darden, Milling, Benson, Woodward, Hillyer, Pierson & Miller, New Orleans, for Chevron U.S.A., Inc., plaintiff, appellee.
Patrick S. Ottinger, Plauché, Hartley, Lapeyre & Ottinger, Lafayette, for Cotton Petroleum Corp., defendant, appellee.
Nathaniel P. Phillips, Jr., James A. Babst, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, for BTA Oil Producers, defendant, appellee.
Frederick B. Alexius, Provosty, Sadler & deLaunay, Alexandria, for Thomas A. Durham, defendant.
William S. Strain, Strain & Mayhall, Baton Rouge, for Continental, McCunn, Horton, Brownlee, Ward & Smith, defendants.
T. Michael White, Harmon & White, Port Allen, for absentee defendants.
Before COVINGTON, LANIER and ALFORD, JJ.
LANIER, Judge.
This is a suit in contract seeking a declaratory judgment to cancel a mineral interest in four conservation units producing from the Tuscaloosa Sand. The trial court rendered judgment cancelling the mineral interest. This suspensive appeal followed.

FACTS
On November 7, 1975, F. Evans Farwell and others (Farwell) executed an oil, gas and mineral lease in favor of Chevron Oil Company (Chevron)[1] and Tomlinson Interests, Inc. (Tomlinson) covering approximately 5,000 acres located in West Baton Rouge Parish, Louisiana. This lease was amended on January 10, 1978, to include an additional 175 acres. Chevron and Tomlinson each acquired a 50% interest in the Farwell lease.
On November 18, 1975, Tomlinson entered into an agreement with BTA Oil Producers (BTA), a partnership composed of several persons, in which BTA agreed to drill a test well on the Farwell lease or on lands pooled therewith. Tomlinson also assigned 30% of the Farwell lease to BTA and "farmed out" its remaining 20% interest insofar as it covered the test well.
*888 Paragraph 10 of this agreement provides as follows:

Chevron Agreement. Tomlinson has advised BTA that preliminary agreement has been reached with Chevron as to joint operations to be conducted on acreage covered by the Farwell Lease or acreage pooled therewith, which preliminary agreement provides (i) that the penalty for a nonconsenting party to a proposed well is loss of unit acreage, insofar as Farwell Lease acreage is included in any such unit, or 640 acres in the absence of a unit, with an acreage adjustment if a unit is later established, and (ii) for Chevron to be operator, except as to a well in which Chevron is a nonconsenting party. It is understood and agreed that following execution hereof, BTA shall join in such negotiations and shall be a party to the written agreement with Chevron finalizing the points listed above. (Emphasis added).
On July 13, 1976, Tomlinson executed a formal assignment in favor of BTA as required by the agreement of November 18, 1975, except that 40% of the Farwell lease was assigned rather than 30%.
On April 29, 1977, Tomlinson assigned to Cotton Petroleum Corporation (Cotton) a 3% interest in the Farwell lease.
Effective July 30, 1977, Chevron, BTA, Cotton and Tomlinson entered into an operating agreement for the drilling and production of the Ashland Plantation well No. 1 in a unit which included a portion of the land covered by the Farwell lease. Paragraph 10.5 of this operating agreement provides that if a party to the agreement did not consent to the drilling of a well and did not advance his proportionate share of the costs of drilling and completing the well, that the parties participating in the well could withhold 350% of the nonconsenting parties proportionate share of the costs out of the production from the well before the nonconsenting party could receive any proceeds from the well. The apparent purpose of this provision and that contained in Section (i) of Paragraph 10 of the Tomlinson-BTA agreement was to penalize a party owning a working interest for not sharing the risk of a dry hole, and to reward those who accept the risk and advance the drilling costs.
On March 31, 1978, Tomlinson and Martin Exploration Company (Martin) entered into a letter agreement whereby Martin would purchase Tomlinson's remaining 7% interest in the Farwell lease, pursuant to an act of assignment to be executed on or before May 15, 1978.
By letter dated May 12, 1978, Tomlinson transmitted to Martin operating agreements proposed by Chevron to cover the O.L. Crawley, Sr. well and the F.E. Farwell well No. 1 which were to be drilled in the False River Field. These wells were in conservation units which included portions of the Farwell lease. These operating agreements each contain a provision identical to Paragraph 10.5 of the Ashland operating agreement authorizing the withholding of 350% of the nonconsenting party's share of the well costs from production.
On May 15, 1978, Tomlinson assigned to Martin its remaining 7% interest in the Farwell lease. This assignment provided, in pertinent part, as follows:
Further, this assignment is made subject to the terms of the following unrecorded agreements:
1. Letter Agreement dated November 18, 1975, between Tomlinson Interests, Inc., and BTA Oil Producers;
. . . . .
5. Operating Agreement effective July 30, 1977, between Chevron U.S.A. Inc. (Operator) and Tomlinson Interests, Inc., BTA Oil Producers and Cotton Petroleum Corporation (Nonoperator) covering the drilling and operation of the Ashland Plantation Well No. 1 located in Section 57, Township 6 South, Range 11 East, West Baton Rouge Parish, Louisiana, as clarified by letter dated May 1, 1978, between Operator and Nonoperator; and
. . . . .
Reference is here made to said agreements for all purposes and the terms *889 thereof, although not specifically stated herein, are made a part hereof as if said terms were completely and fully incorporated herein. Assignor hereby assigns and sets over unto Assignee, and Assignee hereby accepts, all the rights, privileges, benefits, liabilities and obligations of Assignor, both present and future, in the agreements enumerated above under Nos. 1 through 5, SAVE AND EXCEPT the outstanding sum due Tomlinson Interests, Inc., by BTA Oil Producers under the terms of Letter Agreement dated April 14, 1976 (No. 3 above).... (Emphasis added).
Pursuant to this agreement, Martin paid its proportionate share of the costs of drilling the Ashland Plantation well No. 1.
On August 29, 1978, Martin Exploration Company conveyed to Ken G. Martin an overriding royalty interest of 2% of the oil, gas and other minerals produced from the Farwell lease.[2]
Subsequent to the execution of the assignment by Tomlinson to Martin, Chevron, as unit operator, drilled four wells on conservation units containing portions of the land covered by the Farwell lease, namely, the O.L. Crawley, Sr. well and the F.E. Farwell wells Nos. 1, 2 and 3. Martin refused to join in the drilling of these wells, refused to execute operating agreements for them and did not advance his proportionate share of the drilling costs.

INTERPRETATION OF MARTIN'S AGREEMENT
Chevron, BTA and Cotton contend that Martin is bound by Paragraph 10 of the letter agreement between Tomlinson and BTA executed on November 18, 1975, which was incorporated by reference in the assignment by Tomlinson to Martin on May 15, 1978, and that by failing to pay its proportionate share of the costs of the Crawley and three Farwell wells, Martin has lost its 7% working interest in these wells. BTA, Cotton and Chevron also assert that the 7% interest forfeited by Martin was acquired by them on a proportionate basis. Martin contends that Paragraph 10 was an "agreement to agree", and since no final agreement was ultimately reached between the parties, Paragraph 10 has no legal effect. Martin also asserts that after the drilling costs are recovered from each of the four wells, it is entitled to receive its proportionate share of the proceeds from the production of the wells pursuant to La.R.S. 31:177.[3]
The courts are bound to give legal effect to all written contracts according to the true intent of the parties and this intent is to be determined by the words of the contract when these are clear, explicit and lead to no absurd consequences. La.C.C. arts. 1901 and 1945; Campesi v. Margaret Plantation, 417 So.2d 1265 (La.App. 1st Cir. 1982), writ denied 422 So.2d 163 (La.1982). The meaning and intent of the parties to the written contract in such cases must be sought within the four corners of the instrument and cannot be explained or contradicted by parol evidence. La.C.C. art. 2276; Tauzin v. Claitor, 417 So.2d 1304 (La. App. 1st Cir.1982), writ denied 422 So.2d 423 (La.1982).
The words of a contract are to be understood in their common and usual signification. La.C.C. art. 1946; Commercial *890 Union Insurance Co. v. Advance Coating Co., 351 So.2d 1183 (La.1977). In Paragraph 10 of the Tomlinson-BTA agreement, the word "preliminary" is used twice to describe the agreement between Tomlinson and Chevron incorporated therein. The adjective "preliminary" in its usual sense means preceding or coming before. 72 C.J.S. Preliminary, p. 482; Black's Law Dictionary 1062 (5th ed. 1979); Webster's New Collegiate Dictionary 907 (8th ed. 1975). Also in Paragraph 10, BTA agrees to join in "negotiations" and be a party to a written agreement with Chevron "finalizing" the preliminary agreement. The usual meaning of the noun "negotiation" is the process which involves the deliberation, discussion or conference upon the terms of a proposed agreement. 65A C.J.S. Negotiate, p. 1078; Black's Law Dictionary 934 (5th ed. 1979); Webster's New Collegiate Dictionary 769 (8th ed. 1975). The verb transitive "finalize" in its usual sense means to put in finished form or to give final approval to. Webster's New Collegiate Dictionary 429 (8th ed. 1975). If Paragraph 10 described a final or completed agreement between Tomlinson and Chevron, it would not have been referred to as a preliminary agreement. If Paragraph 10 incorporated a final or completed agreement between Tomlinson and Chevron, it would not have been necessary for Tomlinson to require BTA to negotiate and finalize an agreement with Chevron. All that was necessary was to include the completed agreement between Tomlinson and Chevron into Paragraph 10 by reference, such as was done in Paragraphs 5, 6 and 7 of the Tomlinson-BTA agreement when an operating agreement[4] was included by reference.
The terms of an agreement should be interpreted one by the other, giving to each the sense that results from the entire act. La.C.C. art. 1955; Pendleton v. Shell Oil Company, 408 So.2d 1341 (La.1982). The first paragraph of the Tomlinson-BTA agreement specifies that it "... shall constitute a contract and agreement...". By contrast, Paragraph 10 refers to "that preliminary agreement" between Tomlinson and Chevron. Sections 1 through 9 of the Tomlinson-BTA agreement contain specific and complete contractual terms which require no further "finalizing" or "negotiating". In Paragraph 2 of the agreement, Tomlinson assigns 30% of the Farwell lease to BTA and provides that "[A] formal assignment of this interest shall be executed by Tomlinson in favor of BTA upon request of BTA." Paragraph 2 does not provide for negotiations for finalizing the formal assignment of interest as does Paragraph 10. Paragraph 2 does not refer to the assignment contained therein as a preliminary agreement.
If the intent of the parties to a contract is doubtful, the court may determine what construction to put upon it by the manner in which it has been executed by the parties. La.C.C. art. 1956; Crow Drilling & Producing Co. v. Hunt, 254 La. 662, 226 So.2d 487 (1969). BTA, Cotton, Tomlinson and Chevron entered into an operating agreement for the drilling of the Ashland Plantation well No. 1 after the execution of the Tomlinson-BTA agreement. This operating agreement provided that a party owning a working interest who did not consent to the drilling of a well and failed to advance his proportionate share of the drilling costs would pay 350% of his proportionate share out of the production received from the well prior to receiving his proportionate share of the revenues. The operating agreements between Chevron, BTA and Cotton for the O.L. Crawley, Sr. well and the F.E. Farwell well No. 1 contain the same provisions. These three operating agreements do not provide that a nonconsenting party who fails to advance his proportionate share of the well costs will lose his working interest in the unit as does Paragraph 10.
For there to be a binding contract between parties, the will of the parties must unite on the same point. La.C.C. art. 1798. *891 Because the words "preliminary", "negotiations" and "finalizing" are used in Paragraph 10, because Paragraph 10 is couched in significantly less definitive language than Paragraphs 1 through 9 and because Chevron, BTA and Cotton subsequently executed operating agreements with penalty provisions for nonconsenting parties which were different than that contained in Paragraph 10, it is our conclusion that Paragraph 10 is not a binding portion of the contract. La.C.C. arts. 1813 and 1814; I.H. Rubenstein & Son, Inc. v. Sperry & Hutchinson Company, 222 So.2d 329 (La.App. 1st Cir.1969), application denied 254 La. 757, 226 So.2d 521 (1969). Since a final agreement was never consummated on the provisions of Paragraph 10, Martin is not bound by them.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is reversed. The appellees are cast for all costs.
REVERSED.
NOTES
[1] Now named Chevron U.S.A., Inc.
[2] The working interests in the Farwell lease are burdened by various overriding royalty interests. The owners of the working interests entered into a joint stipulation to protect the overriding royalty interests (except that of Ken G. Martin acquired from Martin Exploration Company), and thus these interests are no longer pertinent to these proceedings.
[3] La.R.S. 31:177 provides:

A co-owner of the lessee's interest in a mineral lease may not independently conduct operations or, except as provided in this article and Article 171, deal with the interest without the consent of his co-owner. He may act to prevent waste, destruction, or termination of the lease and to protect the interest of all, but cannot impose upon his co-owner liability for any costs or expenses except out of production. In so acting he must act in good faith and must deal with the interest of the remaining owner or owners in the manner of a reasonably prudent lessee whose interest is not subject to co-ownership. (Emphasis added).
[4] These paragraphs refer to the "Joint Operating Agreement" attached as Exhibit A. There is no Exhibit A attached to the Tomlinson-BTA agreement and no operating agreement in the record has been identified as such.