CULPEPPER, Judge.
Plaintiff-appellee, Superior Oil Company, and third party plaintiffs-appellees, Midwest Oil Corporation and Belco Petroleum Corporation, claim an interest in certain leasehold rights under a joint operating agreement. They contend the defendants, Edwin L. Cox and his assigns, received these lease interests as an “acreage contribution” to the cost of drilling a well, and are required by a “Cash Or Acreage Contributions” clause to share these interests with the other parties to the operating agreement. From an adverse judgment, the defendants appealed. Plaintiffs answered the appeal, seeking certain modifications in the judgment.
The substantial issue is the construction and application of the “Acreage or Cash Contributions” clause in the joint operating agreement.
The facts were stipulated and are not in dispute. Superior, Midwest and one J. P. Owen owned certain oil, gas and mineral leases shaded yellow on Exhibit 40. Midwest and Owen, but not Superior, owned other mineral leases on adjoining land shaded blue on Exhibit 40.
By an agreement dated February 10, 1967 (hereafter referred to as the “yellow farm-out”), Superior, Midwest and Owen, owners of the yellow leases, contracted with the defendant Cox that -if, at his sole expense, he drilled and successfully completed a well at a certain specified location on one of the yellow leases (hereinafter referred to as the test well or Broussard No. 1), Cox would receive a one-half interest in the yellow leases to a depth of 16,000 feet. The yellow farm-out agreement also provided that if the well was successful, the parties would then enter into a joint operating agreement, a copy of which was attached to the yellow farm-out; and which would govern the drilling of future wells or other operations on the yellow leases.
About one month after the yellow farm-out was executed, and prior to the commencement of any drilling by Cox, Midwest and Owen, the owners of the blue leases, entered into a separate agreement hereinafter referred to as the “blue farm-out”. In this instrument, dated March 8, 1967, Cox obligated himself (as distinguished from his mere option to drill under the yellow farm-out) to drill the same test *918 well provided for in the yellow farm-out. Cox also obligated himself to reimburse Midwest and Owen 100% of all rentals falling due under the blue leases while he was engaged in drilling operations under the agreement.
Under the blue farm-out, Midwest and Owen agreed that if the test well was successful, and a production unit was created by the Louisiana Department of Conservation, they would assign to Cox certain interests in those portions of the blue leases included in the unit. Furthermore, whether or not the test well should be completed as a producer, Cox was allowed a period of six months after completion of the test well to drill an additional well for the same consideration, i. e., the assignment to Cox of certain interests in those portions of any blue leases included in the production unit.
By unrecorded agreements in May of 1967, Cox assigned certain of his interests under the blue and yellow farm-outs to the other defendants-appellants, hereinafter referred to as the Cox defendants.
By an instrument dated March 30, 1968, J. P. Owen assigned all of his rights under the blue and yellow farm-outs to third party plaintiff-appellee, Belco Petroleum Corporation. Consequently, hereafter the name Belco will be used in place of Owen.
On or about May 14, 1967, Cox commenced drilling the test well, Broussard No. 1, at the location specified in both the yellow and blue farm-outs. The well was drilled and completed as a producer on or about August 4, 1967. The entire cost of approximatly $718,722 was borne by Cox defendants. It is acknowledged by Superi- or, Midwest and Belco that the Broussard well fulfilled all of the requirements of the yellow and blue farm-outs.
Pursuant to the yellow farm-out, Superi- or, Midwest and Belco assigned to Cox one-half of their interest in the leases shaded yellow on Exhibit 40, to a depth of 16,000 feet. Superior, Midwest, Belco and Cox then executed the joint operating agreement, using the form attached to the yellow farm-out. This joint operating agreement provided that in the event any party desired to drill an additional well on the yellow acreage, such party was required to notify the other parties and afford them an opportunity to join in the operation. If all parties elected to participate, the cost would be borne in proportion to their respective interests. If any party elected not to participate, the cost would be borne solely by those electing to participate. However, in the event of production from said well, provision was made for recovery by the participating parties, out of production allocable to the interest of the non-participating party, of the latter’s share of such costs, with a specified penalty-
After completion of the Broussard well, Cox proposed on August 15, 1967 the drilling of another well known as Pellerin No. 1 on one of the yellow leases. Under the joint operating agreement, Superior, Midwest and Belco elected to participate.
The Pellerin well was commenced on about October 6, 1967. As the drilling progressed, Superior, Midwest and Belco paid to Cox their proportionate shares of the costs monthly as they accrued, in accordance with the operating agreement. The Pellerin well was completed as a producer on February 6, 1968.
Subsequently, the Louisiana Department of Conservation created a unit for the Pel-lerin well embracing portions of the blue leases. Under the provisions of the blue farm-out, Midwest and Belco, by instrument dated December 15, 1968, assigned to Cox two-thirds of their interest, as to all depths above 16,000 feet, and three-fourths of their interest, as to all depths below 16,000 feet, in those portions of the blue leases lying within the Pellerin well unit. These are the leasehold rights in dispute in the present case.
Superior filed this suit contending that the interest assigned by Midwest and Belco *919 to Cox in those portions of the blue leases falling within the Pellerin well unit constitute “acreage contributions” under the provisions of paragraph XX of the joint operating agreement reading as follows:
“XX.
“ACREAGE OR CASH CONTRIBUTIONS
“If any party receives, while this agreement is in force, a contribution of cash toward the drilling of a well or any other operation on the subject leases such contribution shall be paid to the party or parties who conducted the drilling or other operation and same shall be applied against the cost of drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly execute an assignment of the acreage, without warranty of title, to the other parties who participated in such operation for which the acreage contribution was made to support in the proportion of their interest therein. Each party shall promptly notify the other parties of all acreage and money contributions it may obtain in support of any well or other operation on the Joint Area.”
In its original petition filed on August 19, 1969, Superior named Midwest and Bel-co as necessary parties defendants. Two months later, they joined Superior as third party plaintiffs against the Cox defendants.
It is noted that this litigation involves only the Pellerin well, which was drilled under the joint operating agreement whereby Superior, Midwest, Belco and Cox all shared the cost and the risk of the well in proportion to their respective interests. The Broussard well is not at issue since it was not drilled under the joint operating agreement and was drilled by Cox defendants at their sole cost and risk.
Superior, Midwest and Belco contend the provisions of the “Acreage Or Cash Contributions” clause are clear. They say the blue lease interests received by Cox from Midwest and Belco in the Pellerin well unit clearly constitute an “acreage contribution” within the meaning of those provisions. Superior, et al explain that this is a customary clause in joint operating agreements, the rationale of which is that all parties agree to share the cost and risk of drilling the well and to divide any benefits derived therefrom in certain proportions. If any party receives cash or acreage contributions from some “side deal”, he must share these with the other parties. Otherwise, his cost would be less and his benefits more than agreed upon.
We agree the clause is clear and unambiguous. It provides that “If any party receives ... a contribution in the form of acreage, the party to whom the contribution is “made shall promptly execute an assignment of the acreage, without warranty of title, to the other parties who participated in such operation for which the acreage contribution was made to support in the proportion of their interest therein.”
The assignment by Midwest and Belco to Cox was a contribution in the form of acreage toward drilling the Peller-in well. Under the clear language of the operating agreement, Cox must execute an assignment of this acreage to the other parties who participated in the drilling of the well, i. e., Superior, Midwest and Bel-co, in the proportion of their interests.
We now address ourselves to the arguments made by Cox defendants. They say first that the term “acreage contribution” is vague and ambiguous. Webster’s New World Dictionary, College Edition, 1952, defines “contribute” as “to give or provide jointly with others; give to a common fund.” Of course, a contribution can be with or without a valuable consideration. Actually, in the present case there was a valuable consideration. The word “acreage”, as used in the context of the operating agreement, clearly includes the *920 leasehold interests which were described in terms of the acreage affected.
Cox argues that the term “acreage contribution” contemplates a situation under which an owner of leases is interested in obtaining information from a well drilled on other acreage not owned by him, and in return for such information agrees to assign certain leases to the parties drilling the well. He says the leasehold assignment in this suit was not made in return for information but rather for the actual development of leases owned by the assignors, Midwest and Belco. It may be that acreage contributions could be provided in various types of agreements for various purposes. But the purpose and meaning of the “acreage contribution” in the present contract is clear.
Cox argues next that the assignment was not a “contribution” of acreage toward the Pellerin well because Cox paid the cost of $718,722 to drill the test well and he paid about $27,672.50 in rentals on the blue leases during the drilling operations. Cox says the lease interests in question were not a “contribution” but were rights bought and paid for with valuable consideration. Apparently, one aspect of this argument is based on the idea that the word “contribution” means only a donation, and does not contemplate anything received for valuable consideration. As stated above, the dictionary definition of “contribution” is not restricted to donations. A “contribution” includes anything which is given or provided jointly with others. Furthermore, in the context of this business transaction, it is illogical to assume that any of the parties to the operating agreement would receive a “contribution” without paying any consideration in return.
As to Midwest and Belco only, Cox makes the further argument that they did not intend in the blue farm-out that the assignment of blue acreage would be an “acreage contribution” toward the drilling of the Pellerin well. Cox says Midwest and Belco were not third parties helping to finance the cost of a well on leases owned by others, but instead were actually parties to the joint operating agreement under which the well was being drilled. Cox argues that he earned and paid for the right to drill the Pellerin well by drilling the test well (Broussard No. 1), and no further consideration was contemplated to Midwest and Belco. Thus, Cox contends the Midwest and Belco assignment is not an acreage contribution, but instead is a right for which he paid. Cox even asserts, completely contrary to the-terms of the blue farm-out, that the second well had to be drilled on the yellow acreage. We find no such provision in the blue farm-out. Cox had the option to drill the second well either on the yellow acreage or the blue acreage. He chose to drill the Pellerin well on the yellow acreage and thereby subjected himself to all of the provisions of the joint operating agreement under which it was drilled. If he had drilled the second well on the blue acreage, then of course the joint operating agreement at issue here would not have applied. The provisions of the acreage contribution clause are in the joint operating agreement, they are clear, and these experienced oil men should have understood their meaning.
The next argument by Cox is that the agreements are ambiguous and the intention of the parties is revealed by the manner in which they themselves construed the contract after the Pellerin well was completed. The first answer to this argument is that we have already found the contracts are clear and free of ambiguity and must be construed as written.
Furthermore, even assuming there is some ambiguity, there is no basis for the argument that the intention of the parties was shown by their actions. The contention is apparently based on the circulation by Cox of a sheet reflecting certain calculations of interests owned, which tabulation did not show Superior, Belco or Midwest to be entitled to share in the assignment of the blue acreage. Cox argues that the fail *921 ure of Superior, Midwest and Belco to immediately object to these tabulations shows their intention, or acts as a waiver and es-toppel against them.
The facts show that Superior remained silent for a period of about four months after receipt from Cox of a unit tabulation on which Superior was not credited with any portion of the blue lease interests claimed by it in this suit. But Cox then made its claim and thereafter filed this suit on August 19, 1969, which was only about eight months after the assignment on December 15, 1968. Certainly there can be no waiver or estoppel on the part of Superior as to any claim which it had. Superior contends that it actually had no knowledge of the blue farm-out and hence was unaware of the acreage contribution at issue until the unit tabulations were furnished.
As to Belco and Midwest, it is true they did not join in the original suit as plaintiffs with Superior, but they joined as third party plaintiffs against Cox and asserted their claims on October 2, 1969, which was only about ten months after the assignment. Of course, their claims had not prescribed and there is no factual basis for any waiver or estoppel of Belco or Midwest by their delay in joining as third party plaintiffs in this suit.
THE ANSWERS TO THE APPEAL
Superior, Midwest and Belco filed answers to the appeal complaining of that portion of the judgment of the district court which holds that the interests decreed to be owned by the appellees should bear a portion of certain overriding royalty interests conveyed by the Cox defendants to Raleigh W. Upshaw, Stanrich Oil Company and Walter S. Mott. These overrides were assigned by Cox defendants in consideration of geological services rendered.
The facts are that in November of 1966 Upshaw entered into a contract with Cox under which he agreed to investigate geological prospects in the area involved in this suit, in return for 2% of %th overriding royalty interest in any leasehold interests acquired by Cox. Upshaw determined that the area involved in this suit was a good prospect and Cox relied on that information in entering into the blue and yellow farm-out agreements.
Additionally, Cox entered into an agreement with Stanrich Oil Company and Walter S. Mott prior to January 17, 1967 under which they agreed to study the geology pertaining to any drilling prospects in return for an assignment of %4th overriding royalty interest to Mott and %4th overriding royalty interest to Stanrich of the net leasehold interests acquired by Cox in any such prospect. These overriding royalty interests in both the blue and yellow farm-outs were subsequently assigned by Cox to the geologists on September 30, 1968, which was about nine months after the Pellerin well was completed but was before the assignment by Midwest and Belco to Cox on December 15, 1968.
Cox argues, and the district judge held, that the overrides assigned, insofar as they affect the blue leasehold interests at issue here, represented part of the net costs of drilling the Pellerin well. Cox emphasizes the term “Net interest” in any leasehold interest acquired by him in the prospect. Cox therefore argues that this is a drilling cost which must be borne by all parties under the joint operating agreement in proportion to their interest.
Superior, Midwest and Belco contend that Upshaw and the other geologists were simply employees of Cox who were paid for geological services rendered in connection with the entire blue and yellow farm-out agreements, and that they were not direct costs of the Pellerin well. They argue that to permit the Cox defendants to burden the “acreage contributions” with costs not related directly to drilling the Pellerin well would in effect give Cox the power to destroy the rights of Superior, Midwest and Belco under the “Cash Or *922 Acreage Contributions” clause. We find this is correct, and that the judgment appealed must be amended to grant the relief prayed for in the answers to the appeal.
For the reasons assigned, the judgment appealed is amended so as to delete therefrom the provisions that the leasehold interests decreed to be owned by Superior Oil Company, Midwest Oil Corporation and Belco Petroleum Corporation shall bear their proportionate shares of the overriding royalty interests assigned to Stanrich Oil Company, Inc., Walter S. Mott, Jr. and Raleigh W. Upshaw. Other wise, the judgment appealed is affirmed. All costs of this appeal are assessed against the defendants appellants.
Affirmed, as amended.