307 So.2d 350 (1975)
SUPERIOR OIL COMPANY
v.
Edwin L. COX et al.
No. 54734.
Supreme Court of Louisiana.
January 20, 1975.
Rehearing Denied February 21, 1975.
*351 George J. Bailey, Bailey & Hollier, Lafayette, for defendants-applicants.
Gene W. Lafitte, Liskow & Lewis, New Orleans, Lawrence E. Donohoe, Jr., Davidson, Meaux, Onebane, Donohoe, Bernard, Torian & Diaz, Lafayette, for plaintiffs-respondents.
James D. Rives, Jr., New Orleans, for defendant-respondent.
DIXON, Justice.
Plaintiff, Superior Oil Company, and third party plaintiffs, Midwest Oil Corporation and Belco Petroleum Corporation, claim an interest in certain oil and gas leases which Midwest and Belco assigned to defendants, Edwin L. Cox and others. The case involves the interpretation of the "acreage or cash contributions" clause in a joint operating agreement.
From an adverse judgment in the district court, Cox appealed. Plaintiffs answered the appeal, seeking a modification so that the interest of Cox would bear the overriding royalty interest which he assigned to other parties.[1] The Court of Appeal affirmed, but amended in accordance with the answer to the appeal.[2] Upon the application of Cox, we granted certiorari.
The facts were stipulated and are not in dispute. They are generally as follows. Superior, Midwest and Belco owned certain oil, gas and mineral leases shaded yellow on Exhibit 40. Midwest and Belco, but not Superior, owned other mineral leases on adjoining land shaded blue on the exhibit.
By agreement dated February 10, 1967 (hereinafter referred to as the yellow farmout), Superior, Midwest and Belco, owners of the yellow leases, contracted with defendant Cox that if Cox, at his sole expense, drilled and successfully completed a well at a certain specified location on one of the yellow leases (hereinafter referred to as the test well or Broussard No. 1), they would transfer a one-half interest in the yellow leases to him. The yellow farmout agreement also provided that, if the well was successful, the parties would then enter into a joint operating agreement, a copy of which was attached to the yellow farmout and which would govern the drilling of future wells or other operations on the yellow leases.
*352 On March 8, 1967 (about a month after the yellow farmout was executed), Midwest and Belco owners of the blue leases, entered into a separate agreement with Cox (hereinafter referred to as the blue farmout) with regard to the blue leases. In this instrument, Cox obligated himself to drill (as distinguished from the mere option to drill under the yellow farmout), at his own expense, the same test well provided for in the yellow farmout. Cox also obligated himself to reimburse Midwest and Belco 100% of all rentals falling due under the blue leases while he was engaged in drilling operations under this agreement.
Under the blue farmout, Midwest and Belco agreed that, if the test well was productive and if any portion of the blue leases was unitized with said well by the Louisiana Department of Conservation, they would assign to Cox certain interests in those portions of the blue leases included in said unit. In this regard, the blue farmout agreement provides, in essence, that Midwest and Belco would assign to Cox all of their rights in and to the farmout acreage included in said production unit, subject to the condition and reservation that Cox would receive 100% of the production from the test well attributable to the farmout acreage and the full working interest therein, subject to a total lease burden of 25%. The difference between the 25% and the present lease burdens represented the overriding royalty reserved by Midwest and Belco. This would continue until such time as Cox had recovered out of production the cost to drill, complete, equip and operate said test well. At the time of payout, Midwest and Belco had the option of converting their overriding royalty to a one-third working interest in all rights above 16,000 feet, and a one-fourth working interest in all rights below 16,000 feet. They further agreed that whether or not the test well would be completed as a producer, Cox was granted the right, within a period of six months after completion of the test well, to drill an additional well or wells under the same terms and conditions as set forth for the initial test well.
On or about May 14, 1967 Cox commenced drilling the test well (Broussard No. 1) at the location on the yellow leases specified in both the yellow and blue farmouts and completed it as a producer on or about August 4, 1967. The entire cost of approximately $718,722.00 was paid by Cox, as well as the rentals on the blue leases in the aggregate of $27,672.50. It is acknowledged by Superior, Midwest and Belco that the Broussard well fulfilled all of the requirements of both the yellow and blue farmouts.
Upon completion of the test well, and pursuant to the yellow farmout, Superior, Midwest and Belco, by instrument dated October 1, 1967, assigned to Cox one-half of their interest in the yellow leases to a depth of 16,000 feet. On the same day, Superior, Midwest and Belco and Cox executed a second joint operating agreement, using the form attached to the yellow farmout. This joint operating agreement provided that, in the event any party desired to drill an additional well on the yellow acreage, such party was required to notify the other parties and afford them an opportunity to join in the operation. If all parties elected to participate, the cost would be borne in proportion to their respective interests.
After completion of the Broussard well, Cox proposed the drilling of another well, known as Pellerin No. 1, on the yellow leases. Under the joint operating agreement, Superior, Midwest and Belco elected to participate. Cox commenced drilling the Pellerin well on October 6, 1967 and completed it as a producer on February 6, 1968. As drilling progressed, Superior, Midwest and Belco, in accordance with the operating agreement, paid to Cox their proportionate share of the costs as they accrued.
Subsequently, the Louisiana Department of Conservation by Order No. 800, dated May 13, 1968, effective May 1, 1968, created separate units for the Broussard (Mary Tex Sand Unit B) and Pellerin (Mary Gex Sand Unit A) wells. Included in each *353 unit was certain acreage covered by the blue leases. Under the provisions of the blue farmout, Midwest and Belco assigned to Cox interests in the mineral leases covering the blue acreage insofar as those leases were included in the units for the Broussard well (Unit B) and the Pellerin well (Unit A).
No claims are asserted by Superior, Midwest and Belco to any interests in the mineral leases covering the blue acreage included in the Broussard unit. The question to be decided in this case is: were the blue leases in the Pellerin unit governed by the contribution clause in the joint operating agreement of October 1? That clause is as follows:
"ACREAGE OR CASH CONTRIBUTIONS
"If any party receives, while this agreement is in force, a contribution of cash toward the drilling of a well or any other operation on the subject leases such contribution shall be paid to the party or parties who conducted the drilling or other operation and same shall be applied against the cost of drilling or other operation. If the contribution be in form of acreage, the party to whom the contribution is made shall promptly execute an assignment of the acreage, without warranty of title, to the other parties who participated in such operation for which the acreage contribution was made to support in the proportion of their interest therein. Each party shall promptly notify the other parties of all acreage and money contributions it may obtain in support of any well or other operation on the Joint Area."
No jurisprudence clarifying the "contributions" clause has been cited to the court. Cox argues that the blue leases under the Pellerin unit were in no sense a "contribution;" that, in fact, they were earned by him in performing the obligation to drill the Broussard well under the blue farmout, and completing the Pellerin well under the blue farmout and the joint operating agreement of October 1.

The Contentions
Cox further argues that the "contributions" clause has been misconstrued by the courts below, in spite of the fact that the parties themselves properly interpreted the agreement after the formation of the conservation units.
Superior, Midwest and Belco, on the other hand, contend that the "contributions" clause is clear and unambiguous, lending itself to no interpretation other than that required by the plain words of the agreement.
The purpose of the "contributions" clause, argues Superior, Midwest and Belco, is that "if any party to the operatingagreement receives a contribution, in cash or acreage, made toward the drilling of a joint well, it is to inure to the benefit of all parties to the operating agreement who participated in the drilling of the well. If by cash, the contribution is applied toward the total well cost, with the result that the total well cost is reduced and each party participating in the joint well pays less. If the contribution is paid by acreage, that contribution is to be distributed to all parties who participated in drilling the joint well."

The Acquisition by Cox (the "Contribution")
The Pellerin well was a joint operation, and was drilled on yellow leases. The Cox interests owned about half the yellow leases, Cox having received an assignment of a half interest in the yellow leases from Superior, Midwest and Belco as a result of drilling the Broussard well under the yellow and blue farmouts. As to Midwest and Belco, owners of the blue leases, under the blue farmout, Cox had earned the right to drill another well after the completion of the Broussard well. The blue farmout also gave Cox the right to receive certain *354 interests in the blue leases if they were included in conservation units with producing wells. Superior, not an owner of blue leases, was not a party to the blue farmout. Cox's obligation under the blue farmout was different from that under the yellow farmout; Cox's obligation to drill a well was mandatory under the blue farmout, but only potestative under the yellow farmout. Consequently, as far as Superior was concerned, the right to drill the Pellerin well arose under the yellow farmout; as far as Midwest and Belco were concerned, the right to drill the second well arose under the blue farmout.
Nevertheless, the Pellerin well was also drilled under the terms and conditions of the joint operating agreement of October 1. This joint operating agreement set out the proportionate ownership of the yellow leases, and provided that the expenses of exploration were to be borne by the parties in the proportion of their ownership.
It was not until the formation of the conservation department unit that it was known whether any blue leases would be included in the Pellerin unit. At the hearing before the conservation commissioner, Superior, Midwest and Belco attempted to exclude all the blue leases from the Pellerin unit. The record does not disclose the factual explanation, but these parties had agreed to delay the formation of the Broussard unit until after the completion of the Pellerin well. The Broussard well had been drilled in the eastern portion of Section 19, as specified in the blue farmout. The Pellerin well had been drilled in the western portion of Section 19. All the blue leases lay in Section 24, adjoining Section 19 to the west. Cox proposed a "geological" unit; Superior, Midwest and Belco proposed "geographical" units. Geographical units would have excluded blue leases from participation in the two wells drilled by Cox.
The commissioner's order of May 13, effective May 1, established units based on geological evidence which did not follow geographical lines. Consequently, relatively small blue acreage was included in the Broussard unit and relatively large blue acreage was included in the Pellerin unit.
It was only after unitization, and the inclusion of blue acreage in the units, that Cox, for the first time, was entitled to assignments of interests in the blue leases. No one could have known, prior to the formation of the units, that Cox would own any interest in any blue leases. The inclusion of the blue leases in the production unit was also a condition to Cox's acquisition of the right to have blue leases assigned to him.
This is the transactionthe assignment of interests in blue leases from Midwest and Belco to Coxwhich Superior (followed by Midwest and Belco when they were brought into the suit) claims is an "acreage contribution."

Application of the "Contributions" Clause if Unambiguous
If the "contributions" clause is read as if it is clear and specific in its meaning, we note that the only "contribution" covered by the paragraph is a contribution received by a party while the agreement is in force, "toward the drilling of a well."
That is, if the "contributions" clause is clear and unambiguous, it only purports to cover acreage acquired as an incentive toward, or compensation for, drilling a well.
Since Cox's right to an interest in the blue leases never matured until they were included in the production units, it is difficult to state without serious doubt that Cox received the interest in the blue leases as either an incentive for drilling the Pellerin well, or compensation for drilling the well. The hope for the acquisition of blue leases was surely present, but depended ultimately upon the decision of the conservation commissioner in establishing units along geological, not geographical, lines.
Cox's acquisition of the blue leases has no more effect on the relative rights of *355 Superior, Midwest and Belco than would have been the case if Midwest and Belco had conveyed interests in blue leases to third parties, not a party to the joint operating agreement. For the alienation of the leases, Midwest and Belco received the consideration for which they had contracted. Their rights to participate in the production unit were diminished, not because of a side deal between Cox and some person not a party to the agreement, but because of their own arrangement, freely made.
At this point we can note that promptly after Midwest and Belco assigned the blue leases to Cox, they demanded from Cox an adjustment, and received from Cox a return of part of the costs of drilling which Midwest and Belco had previously paid, based on the ownership interests set out in the joint operating agreement. When Cox received the blue leases, he made an adjustment, assuming for himself a greater portion of the costs of drilling.
The adjustment of the ownership interests in the blue leases between Cox on the one hand and Midwest and Belco on the other hand did not in any way affect Superior's percentage participation in the production of the unit. Superior's percentage of the production in the Pellerin unit was the same before Midwest and Belco conveyed Cox's interest in the blue leases to him as it was afterwards. Cox's percentage of production was increased, not at the expense of Superior, but at the expense of Midwest and Belco, who had contracted to assign the blue leases long before the formation of the joint operating agreement.
If the "contributions" clause is to protect the participants of a joint operating agreement against the possibility that one of them might obtain an undue advantage from an outsider at the expense of those paying for the operations, it has a function. No reason has been advanced, however, why the participants might suffer if two or more of them, but not all, rearrange the proportion of their ownership between or among themselves.
The joint operating agreement listed all the leases it covered. All of them were yellow leases. All of them in the Pellerin unit are in Section 19 (except for small yellow acreage in the eastern edge of Section 24 and small acreage in Section 24 lying west of the blue leases). There was no change in ownership of the yellow leases.
The proportionate ownership and proportionate sharing in production from the yellow leasesthe only leases covered by the joint operating agreementwere not changed by Cox's acquisition of the blue leases.
The blue leases were outside the "joint area" covered by the joint operating agreement, and are important only because they were included in the production unit. The interests of Superior, Midwest and Belco are no more prejudiced or diminished than if the blue leases had been sold to an outsider.
Therefore, even if the "contributions" clause is clear and unambiguous, it does not apply here for two reasons: (1) the blue leases were not acquired by Cox as a "contribution . . . toward drilling a well;" (2) Cox's acquisition of the blue leases did not affect Superior's proportionate interest in the production of the unit, and only affected Midwest's and Belco's because of their prior contract to assign.

"When There is Anything Doubtful. . ."
The "contributions" clause is found in many oil and gas form books. No judicial interpretation of the clause has been cited to us, and the only discussion of the clause located is in the 3rd Annual Rocky Mountain Mineral Law Institute at page 299:
"CONTRIBUTIONS OF CASH OR ACREAGE
"Not infrequently, the owner of a lease or leases within the limits of a prospect is unwilling to participate in the joint operation, but is willing to make a contribution of money or acreage to the *356 drilling of a test well by the parties to the joint operation. This, however, is only one of the situations that may result in a contribution to the drilling of a well in the course of the joint operation.
"To eliminate any possibility for misunderstanding on this score, the agreement should provide that any contribution of money that is made by outsiders to any party in the joint operation will be shared with the other parties in proportion to their interests. If the contribution consists of a lease or leases, the party receiving the contribution should be required to notify all of the other parties, with full particulars concerning such lease or leases, whereupon each of the other parties would have the option to participate therein in proportion to its interest in the joint operation. However, care should be taken to make the participation in a contribution of acreage optional, so that no party will be obligated to assume the burdens imposed by the lease or leases, otherwise than at its election. Of course, if all parties elect to participate in an acreage contribution the lease or leases acquired should be made subject to the operating agreement."
The one clear idea, applicable to the case before us, to be drawn from this discussion, is that "contributions" are made by outsidersthose not party to the joint operating agreement. Only in this way when one of the participants in the joint operating agreement receives a contribution toward the operations from someone not a party to the joint operating agreementdoes the function of the clause become clear. Only in this way does the recipient of the "contribution" profit at the expense of his partners.
Since the clause before us does not limit "contributions . . . toward the drilling of a well" to those made by outsiders, there are doubts about its function and meaning. "When there is anything doubtful in agreements, we must endeavor to ascertain what was the common intention of the parties, rather than to adhere to the literal sense of the terms." C. C.1950. Crow Drilling & Producing Co. v. Hunt, 254 La. 662, 226 So.2d 487 (1969); Jacka v. Ouachita Parish School Board, 249 La. 223, 186 So.2d 571 (1966). French law would add that "an agreement includes, however general its terms may be, only the object to which the parties have intended to contract." Civil Law Translations 1, Aubry & Rau, Kinds of Obligations, § 347 at page 349.
Therefore, what the parties did after the inclusion of the blue leases in the Pellerin production unit is relevant to determine the common intention of the parties. After the formation of the unit, Belco demanded an adjustment in a letter in which it set out that its working interest had been reduced from 9.120% to 1.47312%, before payout. This adjustment resulted from the inclusion of the blue leases in the Pellerin unit. The adjustment was made and Cox made a refund of well costs to each of the plaintiffs. Midwest and Belco cashed the refund checks and retained the funds. Superior remained silent for four months and returned the check.
Midwest and Belco did not join Superior as plaintiffs in this litigation, but were brought in as defendants.
This adjustment, the assignment of the blue leases by Midwest and Belco and the failure of Midwest and Belco to make any demand until required to by Superior's suit, constitute evidence that the parties to the agreement did not contemplate that the assignment to Cox of the blue leases would be considered an "acreage contribution."
For these reasons, Superior has failed to establish a right to share in the blue leases, and the plaintiff's and third party plaintiffs' demands should be rejected.
There is now judgment in favor of defendants, Edwin L. Cox, Fred Snuggs, C. F. Braun & Company, Diamond Shamrock Corporation, Ralph H. Snuggs, Winnifred *357 Ray and Hilton T. Ray, and against plaintiff, Superior Oil Company, and against Midwest Oil Corporation and Belco Petroleum Corporation, rejecting the demands of plaintiff and third party plaintiffs, at their cost.
BARHAM, J., concurs in decree only and assigns reasons.
SANDERS, C. J., concurs for the reasons assigned by BARHAM, J.
MARCUS, J., dissents and assigns reasons.
BARHAM, Justice (concurring in decree only).
I concur only in the decree because I cannot subscribe to the resolution of these issues on a simple factual basis when there exists a serious legal question which needs determination and when answered puts at rest all issues. It is my opinion that this Court is derelict in its duty when it circumvents an important legal issue in such a manner.
In my opinion, the majority fails, as did the court of appeal, to address itself to the real consequences of the blue farmout agreement of March 8, 1967. It is very pertinent that we are concerned only with the "Contributions" clause of the second operating agreement, executed October 1, 1967, several months after the confection of the blue farmout agreement. The blue farmout agreement of March 8, 1967, affected only the blue leases, i. e., those owned by Midwest and Belco. The agreement provided that Midwest and Belco would assign the blue leases to Cox "if the test well is drilled in accordance with the terms and conditions hereof and as completed as a well capable of producing in commercial quantities;" and if any of the blue farmout acreage "is included in the production unit." The option in the blue farmout contract under which the second, or Pellerin, well was drilled was subject to the same condition which applied to the drilling of the test well.[1]
The majority opinion avoids the analysis of the blue farmout agreement which I consider necessary to the proper determination of the parties' rights. The blue farmout agreement is an innominate contract. Its object in general is to transfer ownership in a leasehold for services and other consideration. See S. Litvinoff, 6 Louisiana Civil Law Treatise, Obligations, Book 1, § 200 at 361 (1969). The assignment of the leases from Midwest and Belco to Cox was merely suspended pending the fulfillment of the suspensive condition of completion of a commercially productive well which, when unitized, contained acreage within the blue leases. Inclusion of the acreage upon unitization was a part of the suspensive condition. Thus it is clear that the blue farmout agreement of March 8, 1967, constituted a binding contract to assign, subject to a suspensive condition, all of the blue leases to Cox. La. C.C. arts. 2021, 2043. Upon the completion of the well as commercially productive and the unitization of Unit A, the condition was fulfilled and the obligation which it suspended came into being. However, and this is a significant theoretical difference from the majority's opinion, the realization of the obligation of assignment was retroactive in nearly all respects and is therefore considered to have realized its effects at the moment the obligation was contracted. 1 M. Planiol, Treatise on the Civil Law §§ 319, 321 at 215-216 (12th ed. L.S. L.I. transl. 1939). La.C.C. art. 2041 provides: "The condition being complied with, has a retrospective effect to the day that the engagement was contracted; * * *." Upon fulfillment of the condition, the obligation and its correlative right are considered *358 as never having been subject to a condition. 4 C. Aubry and C. Rau, Cours de droit civil français § 302 at 73 (6th ed. L.S.L.I. transl. 1965). Applying these principles, it is clear that there was no subsequent acquisition by Cox within the meaning of a receipt[2] of cash or acreage as used in the "Contributions" clause. Cox had already acquired the right of assignment of the blue leases subject only to a suspensive condition before the October operating agreement.
The only basis upon which Cox's prior acquisition could be attacked by Superior would be by establishing a breach of a fiduciary relationship by Cox. No such contention has ever been presented. All the parties to the agreement were knowledgeable in the oil and gas industry. There is no complaint that any of the parties have acted other than in good faith in their dealings with each other. Cox acquired the blue lease acreage in exchange for his services and at considerable extra cost, i. e., $746,000 in drilling costs for the Broussard well and in delay rentals on the blue leases.
For these reasons, it is my opinion that the blue leases were not a contribution to Cox for the drilling of the Pellerin well under the operating agreement for that well. Cox had acquired the right to require assignment of the blue leases under the blue farmout agreement which had been executed prior to the operating agreement. Upon unitization of the Pellerin well, Midwest and Belco were required to assign their leases to Cox because there had been fulfillment of the suspensive condition expressed in the blue farmout agreement of May 8, 1967. Cox had acquired a real right in the leases under the blue farmout agreement.
In summary, the blue farmout agreement was a contract to assign. A contract to sell or to assign which contains a suspensive condition is made executory as of the date of the agreement to sell or to assign under the retrospective effect accorded by La.C.C. art. 2041. In Ober v. Williams, 213 La. 568, 580, 35 So.2d 219, 223 (1948), the Court said:
"* * * On the contrary, compliance with the condition only renders the result executory; makes the reciprocal promises absolute and establishes the rights and liabilities of the parties as of the date of the agreement."
Therefore, when Cox signed the operating agreement with Superior, Midwest and Belco on October 1, 1967, the contract of May 8, 1967, gave him the absolute right to demand assignment of the blue leases by Belco and Midwest. Thus, part of his patrimony at that time consisted of a real right in the blue leases which he could enforce by demanding assignment of the leases through an action for specific performance.
An analysis of the problem such as the one above renders unnecessary any interpretation of the particular "Contributions" clause in this contract such as that resorted to by the majority. Additionally, it is my opinion that the majority's interpretation of that clause is erroneous. The majority states that Cox's right to an interest in the blue leases "never matured until they were included in the production units," and concludes that therefore Cox cannot be considered as having received the interest as an incentive toward or as compensation for drilling the well. In my opinion, as stated above, Cox possessed the right prior to unitization, albeit subject to a suspensive condition. Once that condition was fulfilled, the obligation on the part of Midwest and Belco operated retrospectively, as if the condition had never existed.
For the reasons assigned, I am unable to join in the opinion of the majority, and respectfully concur in the decree only.
*359 MARCUS, Justice (dissenting).
A review of the record and the contentions urged, both in brief and in argument before this court, cause me to analyze and resolve the issue presented in the following manner, contrary to the majority opinion.
Superior, Midwest and Belco claim that they are entitled to their pro-rata share of the interest acquired by Cox in the blue leases included in the Pellerin well unit, as that well was drilled pursuant to the joint operating agreement and, therefore, those portions of the blue leases falling within the Pellerin well unit constitute "acreage contributions" under the provisions of paragraph XX of the joint operating agreement. They further allege that this is a customary clause in joint operating agreements, the purpose of which is to insure that all parties who share the cost and risk of the common effort be treated equally. Therefore, any party who receives cash or acreage contribution from some "side deal" must share same with the other participating parties. Otherwise, such party would gain an unfair advantage contrary to the terms agreed upon.
On the other hand, Cox argues that the assignment of mineral leases covering the blue acreage which are included in the Pellerin well unit is not an "acreage contribution" within the meaning of paragraph XX of the joint operating agreement. Cox asserts that this assignment was not a contribution, but a right earned for a valuable consideration, i. e., the $746,394.50 expended solely by Cox in the drilling of the Broussard well.
As stated by the majority, the crucial question posed by this litigation is whether the assignment by Midwest and Belco to Cox of the mineral leases covering the blue acreage which are included in the Pellerin well unit is subject to the "acreage or cash contributions" clause set forth in paragraph XX of the joint operating agreement.
There are no cases in our jurisprudence interpreting an "acreage or cash contributions" clause such as found in the present joint operating agreement. It is a matter of first impression. However, in my opinion, the language of the clause is clear and unambiguous. It plainly states that, if any party receives, while the agreement is in force, a contribution of cash toward the drilling of a well or any other operation on the subject leases, such contribution shall be paid to the parties who conducted the drilling or other operation, and same shall be applied against the cost of drilling or other expenditures. If the contribution be in the form of acreage, the party to whom the contribution is made shall properly execute an assignment of acreage to the other parties who participated in such operation for which the acreage contribution was made to support in the proportion of their interest therein.
In my view, an examination of the facts reveals that there is no merit to the argument advanced by Cox. It is true that Cox expended over $746,000.00 in drilling the Broussard well and in paying rentals on the blue leases; however, he received valuable consideration for these expenditures. After successfully completing the Broussard well, Superior, Midwest and Belco assigned to Cox one-half interest in the yellow leases to a depth of 16,000 feet in accordance with the yellow farmout. Under the blue farmout, Midwest and Belco assigned to Cox certain interests in the blue leases included in the unit formed by the Louisiana Department of Conservation for the Broussard well. Therefore, it can hardly be said that Cox did not receive valuable consideration for the drilling of the Broussard well.
After completing the Broussard well, Cox had the right to drill an additional well. He had no obligation to do so. He also had the right of selecting the location of the second well. He could have drilled it either on the yellow acreage or the blue acreage. If he drilled it on the yellow acreage, he would subject himself to the provisions of the joint operating agreement which provided, in essence, that, if a party decided to drill an additional well on the yellow acreage, such party was required to *360 notify the other parties and afford them an opportunity to join in the operation. If all parties elected to participate, the cost would be borne in proportion to their respective interests. The joint operating agreement also contained the "acreage or cash contributions" clause as set forth in paragraph XX. On the other hand, Cox could have drilled the second well on the blue acreage. However, under the blue farmout, he would have had to drill within six months after completion of the Broussard well under the same terms and conditions as set forth for the initial well, i. e., payment of all drilling costs, together with the rentals due under the blue leases while engaged in the drilling operation.
Thus, Cox was fully aware of the alternatives and consequences at the time he proposed the drilling of the second well (Pellerin No. 1) on the yellow leases. In accordance with the joint operating agreement, Superior, Midwest and Belco paid Cox their proportionate share of the costs as they accrued. The Pellerin well was completed as a producer and thereafter unitized by the Department of Conservation. Included in said unit was a portion of the blue acreage which was subject to the blue leases. Pursuant to the blue farmout, Midwest and Belco assigned certain interests in these blue leases to Cox. It is this assignment which is the subject of the present dispute.
The language of the "acreage or cash contributions" clause in the joint operating agreement clearly provides that any cash or acreage received toward or in support of the drilling of a well or any operation of the subject leases (yellow) shall be applied against the cost of drilling the well or, in the case of acreage, assigned to the other participating parties in proportion to their interests therein.
Cox knew that by electing to drill on the yellow leases under the joint operating agreement, he would obtain the advantage of having Superior, Midwest and Belco share in the cost and risk of drilling the Pellerin well. He was also aware of the existence of the "acreage contributions" clause in said operating agreement. He further knew that, if the Pellerin well was completed as a producer and, if any portion of the blue leases was included in the unitization of said well by the Department of Conservation, Midwest and Belco would be obligated to assign certain interests in these blue leases to him. Being aware of these facts, he decided to drill the second well (Pellerin) on the yellow leases. Cox was an experienced oil man. He cannot now be permitted to repudiate the clear and unambiguous language of the "acreage contributions" clause.
Therefore, I have no difficulty in concluding, as did the court of appeal, that the assignment by Midwest and Belco of the blue leases in the Pellerin well unit constituted a contribution in the form of acreage toward drilling the Pellerin well. It is important to note that Cox freely contracted to drill and pay for the Broussard well in order to earn valuable leasehold rights in the yellow acreage as well as in the blue leases which were unitized with that well. Having drilled the Broussard well, Cox was assigned those rights. Superior, Midwest and Belco readily acknowledge that they have no claim to same. The assignment involved herein was made only after the Pellerin well was drilled. The mere fact that the Broussard well earned Cox the right, but not the obligation, to earn additional rights by the drilling of the second well (Pellerin), which did not have to be drilled on the yellow acreage, does not change the fact that the drilling of the Pellerin well resulted in the assignment of the acreage in the Pellerin unit. In other words, it was the drilling of the Pellerin well that created the obligation upon the part of Midwest and Belco to make the disputed assignment; it was on the basis of this obligation that the assignment was made and not as a result of any consideration paid by Cox in connection with the drilling of the Broussard well.
For the foregoing reasons, I respectfully dissent.
NOTES
[1] Superior, Midwest and Belco urged in their answer to the appeal that the judgment be affirmed in all respects except that it be amended to provide that Cox would bear exclusively out of his interest, the overriding royalty interest which Cox (in consideration of geological services) assigned to Raleigh W. Upshaw, Stanrich Oil Company and Walter S. Mott. The Court of Appeal so amended the judgment. In the application for writs, Cox did not assign as error this portion of the judgment. The brief of Cox filed in this court does not mention this issue. Hence, the holding that the Cox interest would bear, exclusively, the Stanrich, et al. overriding royalty interest is apparently not at issue.
[2] 290 So.2d 916 (La.App.3d Cir. 1974).
[1] That the second well was drilled under an option clause provided in the blue farmout agreement should not change the result. The exercise of the option merely activated the agreement containing the suspensive condition.
[2] "If any party receives, while this agreement is in force, a contribution * * *." (Emphasis here and elsewhere supplied).