487 So.2d 655 (1986)
COMMERCIAL BANK & TRUST COMPANY
v.
BANK OF LOUISIANA and Investment Diamond Wholesalers, Inc.
No. 85-CA-709.
Court of Appeal of Louisiana, Fifth Circuit.
April 14, 1986.
*656 Middleberg & Riddle, Paul J. Mirabile, Metairie, for plaintiff-appellant.
Bach & Wasserman, Sidney M. Bach, New Orleans, for Bank of Louisiana in New Orleans, defendant-appellee.
Before CHEHARDY, DUFRESNE and WICKER, JJ.
CHEHARDY, Judge.
This lawsuit is a dispute between two banks over which shall bear a loss resulting from credit card fraud.
Commercial Bank & Trust Company (CBT), plaintiff, sued the Bank of Louisiana (BOL) and Investment Diamond Wholesalers, Inc. (IDW) to recover more than $16,000 in losses resulting from the use of counterfeit credit cards to imprint charge purchase drafts submitted by IDW, a merchant. IDW deposited the forged sales drafts in its VISA account at CBT, which credited IDW's account. CBT then deposited the sales drafts in its VISA account at BOL, which credited CBT's account and forwarded the sales drafts to the various banks issuing the cards upon which the sales were made.
Those banks rejected the drafts as being forged or counterfeit and refused to pay BOL, whereupon BOL charged-back (debited) the amounts to CBT's account. CBT attempted to charge-back the drafts against IDW's account but the funds were insufficient. CBT then filed suit against both BOL and IDW. IDW went bankrupt, however, and the proceedings against it were stayed. At trial the contest lay entirely between the two banks.
At issue is whether CBT's status as an agent bank for BOL applies to the losses suffered in this situation. In its credit card operation (VISA/Mastercharge/Mr. BOL), BOL uses the name Southern States Bankcard Association (SSBA). SSBA processes sales drafts generated by merchants through agreement with its agent banks such as CBT. The agent banks issue the credit cards under their own name, but SSBA performs all billing, recordkeeping, correspondence and collection functions. The agent banks receive fees for their part of the operation, which consists of issuing credit cards to consumers and of soliciting merchants to become part of the system by accepting the credit cards. The merchants open an account with the agent bank for deposit of the credit card sales drafts. (We note that none of the counterfeit cards used in this case were on accounts issued by CBT.)
At trial the matter was decided wholly on the basis of a letter, written by the president of BOL to the president of CBT and signed by both presidents, which apparently was the only written contract between them:
"In accordance with our understanding, please accept the following which constitutes an agreement between the Commercial Bank & Trust Company and the Bank of Louisiana governing the general terms and conditions under which the Commercial Bank & Trust Company will *657 participate as an agent bank of the Bank of Louisiana in the Mr. BOL/Master Charge/Visa program.
The Bank of Louisiana will:
a) furnish all decals, point of sale materials, sales slips, and credit return vouchers; and,
b) furnish an authorization system; and,
c) under our new fee schedule we will service your VISA, Master Charge and Mr. BOL deposits at a fee of 2% of net sales, regardless of which card is used; and,
d) credit your checking account $4.00 for every approved credit application up to 1500 accounts. From 1501 accounts and up you will receive $3.00 each.
The Commercial Bank & Trust Company will:
a) act as an agent of the Bank of Louisiana for the purpose of installing merchant members and the honoring of Mr. BOL, Master Charge and VISA cards, and it will retain the customary $25.00 installation fee; and,
b) accept deposits from and credit Mr. BOL/Master Charge/Visa merchant accounts; and,
c) in addition to sharing in the merchant discount shown above, your bank will also share in the customer service charge (1½% monthly) imposed against cardholders generated through your bank. With 500 accounts you will receive 5% of the gross service charge after deductions for bad debts. This amount increases to 10% with 1,000 accounts and 15% with more than 2,000 accounts; and,
d) advertise and promote the Mr. BOL/Master Charge/VISA service as advertising budgets permit; and,
e) service participating Mr. BOL/Master Charge/VISA merchants with supplies and display materials and observe that participating merchants properly associate themselves with the Mr. BOL/Master Charge/VISA service; and,
f) purchase from the Bank of Louisiana at its cost the addressograph imprinters whenever needed by Mr. BOL/Master Charge/VISA participating merchants.
The operations of the program will be handled in conformity with the present system, subject to modification where needed, and the Bank of Louisiana agrees to give ample advance notice whenever such changes are made. The fee structure is binding on Bank of Louisiana for one year. Commercial Bank & Trust Company agrees to maintain a collected average balance of $50,000, and has the right to cancel this agreement at any time.
The issuance of charge cards will be in the name of Commercial Bank & Trust Company; however, all income, expense, funding and bad debts will inure to Bank of Louisiana.

In connection with this agreement between the Commercial Bank & Trust Company and the Bank of Louisiana, the Bank of Louisiana agrees to indemnify and to hold harmless the Commercial Bank & Trust Company from any and all liabilities and responsibilities as a result of the functioning of the Commercial Bank & Trust Company as an agent bank of the Bank of Louisiana for purposes of this agreement; and, furthermore, the Bank of Louisiana agrees to indemnify the Commercial Bank & Trust Company for any litigation and to provide said bank with a defense at no cost to the Commercial Bank & Trust Company in the event litigation develops.

Should the above be in accordance with your understanding and agreement, please indicate your acceptance by signing in the space provided below." (Emphasis added.)
CBT argued that under this agreement it was an agent for BOL and therefore BOL, as principal, must bear the losses resulting from the fraudulent transactions. BOL argued that the agency relationship described in the agreement covered only situations in *658 which CBT incurred liability to a third party, but did not cover situations in which CBT suffered a loss, such as here.
There was some evidence of carelessness by CBT employees in accepting the sales drafts from IDW without questioning certain obvious defects in the manner in which the drafts had been written. That evidence was excluded by the trial judge because BOL had failed to plead CBT's negligence as an affirmative defense. There was also evidence that BOL had informed CBT of the possible merchant fraud early enough for CBT to have mitigated the losses substantially by immediately cutting off IDW from the credit card program.
In his oral reasons for judgment, the trial judge stated he had at first interpreted the agreement in favor of CBT, citing the clause that states "[BOL] agrees to indemnify and to hold harmless [CBT] from any and all liabilities and responsibilities as a result of the functioning of [CBT] as an agent bank of [BOL] for purposes of this agreement * * *." On further consideration, however, he had concluded this phrase was not applicable because in this situation there were no claims being made against CBT by third parties. (The cardholders whose names and account numbers had been fraudulently used had not been held liable for the resulting debts by their respective card issuers.)
The judge pointed out that one of the requisites of a contract is "a meeting of the minds." He stated, "I can't imagine the Bank of Louisiana, or CBT, if they were in that similar situation, * * * would accept and indemnify and take total responsibility for anything that Commercial Bank and Trust would do; for example, teller error." He then referred to the excluded evidence indicating that CBT employees had carelessly accepted obviously fraudulent sales drafts.
Further, he found the phrase "all income, expense, funding and bad debts will inure to Bank of Louisiana" was not applicable because "[in] ordinary usage [a bad debt] doesn't encompass a fraudulent transaction * * *." He also noted he "came very close to saying the whole contract is void because it's full of stuff that looks contradictory * * *" but felt that was not "the subject of discussion" before him. As a result, he dismissed CBT's demand against BOL.
On appeal both parties reiterate the positions they asserted in the district court.
It can be argued that these transactions fit within the Louisiana Commercial Laws, specifically LSA-R.S. 10:4-101, et seq. (entitled Bank Deposits and Collections). (Although the credit card sales drafts are plainly not negotiable instruments, nonetheless they seem to fit within the definition of "items" for purposes of bank deposits and collections.)
Neither the parties nor the trial judge have referred to these laws, however, relying entirely upon the contract between the banks. LSA-R.S. 10:4-103 allows the provisions of that chapter of the Commercial Laws to be varied by agreement "except that no agreement can disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care * * *."
Reviewing the pertinent language of the agreement between BOL and CBT, we conclude that the matter is a straightforward matter of contract interpretation. The contract states that CBT will participate as an agent bank of BOL in the credit card program; that CBT will act as an agent of BOL for the purpose of installing merchant members and the honoring of the credit cards; that all bad debts will inure to BOL; that BOL agrees to indemnify and to hold harmless CBT from any and all liabilities and responsibilities as the result of the functioning of CBT as an agent bank of BOL for purposes of the agreement.
BOL and the trial judge interpreted this language as applying only to "bad debts" emanating from the failure of cardholders to pay their accounts but not to "bad debts" resulting from merchant fraud or fraud by other parties in use of legitimate account numbers. BOL and the trial judge also interpreted this language as meaning, since CBT was not liable to any third parties *659 for the amounts it had credited to IDW's VISA account, that BOL was not required to indemnify and hold harmless CBT.
The contract does not specify precisely the scope of CBT's role as "agent of [BOL] for the purpose of * * * the honoring of [credit] cards." CBT contends that Louisiana agency law requires that the agent be compensated for losses suffered in acting for his principal unless the losses occur through his own fault. LSA-C.C art. 3024.
BOL argues, on the other hand, that the agency relationship described in the contract extended only to the credit cards issued in CBT's name and that the agency was not intended to apply to all transactions. BOL asserts that the benefits (i.e., income) and liabilities (i.e., expenses and bad debts) that accrue to BOL are derived solely from credit cards issued by CBT, not from credit cards issued by other banks.
It is undisputed that none of the counterfeit cards used in the fraudulent transactions were for CBT credit card accounts. (Apparently most were in the names of out-of-state banks.) Thus, there are no "bad debts" arising from CBT cards involved in the losses herein.
The Civil Code rules on interpretation of contracts require us to determine the "common intent" of the parties (LSA-C.C. art. 2045; former LSA-C.C. art. 1950). A provision susceptible of different meanings must be interpreted so as to render it effective (LSA-C.C. art. 2049; former LSA-C.C. art. 1951). Each provision must be interpreted in light of the others to give each the meaning suggested by the contract as a whole (LSA-C.C. art. 2050; former LSA-C.C. art. 1955). When the parties made no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the contract's express provisions but also to whatever the law, equity or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose (LSA-C.C. art. 2054). In case of doubt that cannot be otherwise resolved a contract must be interpreted against the party who furnished its text (LSA-C.C. art. 2056; former LSA-C.C. art. 1958).
In cases in which a contract is ambiguous, the agreement must be construed according to the intent of the parties. Intent is an issue of fact which is to be inferred from all of the surrounding circumstances. Kuswa & Assoc. v. Thibaut Const. Co., 463 So.2d 1264 (La.1985).
An appellate court must accord deference to a trial judge's factual findings on the intent of contracting parties, where those findings are reasonable and adequately supported by credible evidence, or else the appellate court must articulate the reason that the finding was manifestly erroneous. Id.
We find no manifest error in the trial judge's findings regarding the intent of the banks in this case. Interpreting the contract as a whole, we cannot construe it as implying that the parties intended BOL to bear all losses derived from any credit card transaction. We find, rather, that the contract envisioned BOL as a principal/indemnitor to stand behind CBT for claims or bad debts derived from cards issued in CBT's name. Therefore the trial judge correctly dismissed CBT's claim for the losses incurred here.
CBT also asserts it is entitled to attorney's fees under the language of the contract. Specifically, the last sentence of the second-to-last paragraph states, "[F]urthermore, [BOL] agrees to indemnify [CBT] for any litigation and to provide said bank with a defense at no cost to [CBT] in the event litigation develops." (Emphasis added.)
Although the first clause of that sentence states "any litigation," that clause is coupled with the clause "provide with a defense." We do not interpret it as indicating there was any intention that BOL shoulder CBT's attorney fees in litigation between the two banks. Rather, use of the term "defense" implies that the paragraph was intended to apply to litigation between CBT and third parties. Accordingly, CBT *660 may not recover attorney's fees from BOL for litigation between itself and BOL.
For the foregoing reasons, the judgment of the district court is affirmed. Costs of this appeal are assessed against appellant.
AFFIRMED.