637 So.2d 1202 (1994)
MARTIN EXPLORATION COMPANY
v.
AMOCO PRODUCTION COMPANY.
No. 93 CA 0349.
Court of Appeal of Louisiana, First Circuit.
May 20, 1994.
Rehearing Denied June 27, 1994.
*1203 Judith V. Windhorst, Carl D. Rosenblum, Robin D. McGuire, New Orleans, Mr. Dana K. Larpenteur, Plaquemine, for plaintiffs-appellants Wells Fargo Bank and ATC Realty Eight, Inc.
J. Clayton Johnson, Jr., Brett P. Furr, Baton Rouge, Mr. David M. Ellison, Baton Rouge, for defendant-appellee Amoco Production Co.
Before FOIL, PITCHER and PARRO, JJ.
PITCHER, Judge.
This appeal arises from the trial court's judgment denying Martin Exploration Company's (MECO) claim against Amoco Production Company (Amoco) for a contribution of acreage pursuant to an operating agreement. We affirm.

FACTS
In the fall of 1979, Amoco owned mineral leases in the Morganza area of Pointe Coupee Parish. Amoco wrote letters to the other mineral lessees in the area, including MECO, Gulf Oil Corporation (Gulf), and Chevron U.S.A., Inc. (Chevron), requesting that they farm out their acreage to Amoco.[1]
Amoco and Gulf finalized a farmout agreement on March 10, 1980, in which Gulf committed to assign to Amoco an interest in its Ravenswood lease (referred to as the red acreage[2]) in return for Amoco drilling a well in a unit which included the red acreage. Unlike Gulf, MECO would not agree to a farmout, but instead a letter agreement was negotiated on February 7, 1980, between MECO and Amoco, which provided that Amoco would drill a well (the Hess well) to *1204 test the Morganza prospect. Initially, MECO did not commit to pay any of the costs of the Hess well. However, if a portion of MECO's leases (referred to as the blue acreage) was included in the Hess unit, MECO was required to either join with Amoco in a mutually satisfactory operating agreement or farm out its blue acreage to Amoco. As to subsequent wells in the Morganza prospect, MECO committed to either join "up front" in the risk and cost of drilling those wells or farm out its acreage on a well-by-well, unit-by-unit basis.
Under the terms of the letter agreement, if MECO elected to join with Amoco in the drilling of subsequent wells, MECO would be responsible for its share of drilling expenses whether or not the well was successful. If MECO chose to farm out its blue acreage, Amoco would pay all of the drilling costs, but in return, Amoco would be assigned a portion of MECO's interest.
Operations on the Hess well began in December of 1979, and continued through August of 1980. In July of 1980, Amoco began operations on the Ravenswood Company, Inc. "B" No. 1 Well (Ravenswood well), located on Amoco's Gulf farmout acreage (the red acreage).
By letter dated August 13, 1980, Amoco requested that MECO elect to either farm out its interest in the blue acreage or participate in the drilling of the Ravenswood well. By letter dated August 28, 1980, MECO elected to participate in the drilling of the Ravenswood well under the terms of the February 7, 1980 letter agreement, including the execution of a "mutually satisfactory operating agreement."
In October of 1980, Amoco sent to MECO a proposed operating agreement, dated to be effective as of October 21, 1980. The proposed operating agreement was a "Model Form Operating Agreement, A.A.P.L. Form 610-1977," a common form of agreement used in the oil and gas industry. Article III.B of the proposed operating agreement provided that the interests of the parties in costs, liabilities and production of the Ravenswood well would be as shown on Exhibit "A". Exhibit "A" is a typed addendum attached to the printed form of the operating agreement and sets forth the interests owned by each mineral lessee. This proposed operating agreement also contained Article VIII.C, commonly referred to as the "Contribution Clause."
Thereafter, Amoco and MECO negotiated and revised the terms of the proposed operating agreement. Apparently, MECO changed the effective date of the operating agreement to January 1, 1980, and then, the operating agreement was executed by Ken Martin on behalf of MECO on January 23, 1981. The operating agreement, with the January 1, 1980 effective date, was forwarded to Amoco. Dale Gilliam, who was to execute the operating agreement on behalf of Amoco, noticed that the effective date had been changed. He checked the operating agreement for other changes, and referred to Exhibit "A" to confirm that there had been no change in the parties' interests. Dale Gilliam executed the operating agreement on Amoco's behalf on February 13, 1981.
On April 29, 1981, MECO made demand on Amoco for contribution of its share in the red acreage by virtue of its participation in the drilling of the Ravenswood well. Amoco refused to tender to MECO a proportionate share of the red acreage.
On March 18, 1982, MECO[3] instituted this action against Amoco, alleging that Amoco breached the operating agreement. Specifically, MECO claimed that Amoco failed to follow the terms of the agreement, particularly the Contribution Clause. MECO alleged that the Contribution Clause obligated Amoco to "promptly notify" MECO of the *1205 farmout agreement entered into between Amoco and Gulf, and to "promptly tender" to MECO a share of the acreage earned from Gulf by virtue of the drilling of the Ravenswood well.
After a lengthy trial, the trial court denied MECO's claim. It is from this judgment that MECO now appeals.

CONTRACT INTERPRETATION
The controversy in this case centers on the interpretation and application of several clauses in the operating agreement.
A contract between parties is the law between them, and the courts are obligated to give legal effect to such contracts according to the true intent of the parties. LSA-C.C. art. 2045; Bailey v. Franks Petroleum, Inc., 479 So.2d 563, 566 (La.App. 1st Cir.1985); G/O Enterprises, Inc. v. Mid Louisiana Gas Company, 444 So.2d 1279, 1285 (La.App. 4th Cir.), writ denied, 446 So.2d 318 (La.1984); Rebstock v. Birthright Oil & Gas Co., 406 So.2d 636, 640 (La.App. 1st Cir.), writ denied, 407 So.2d 742 (La.1981). This intent is to be determined by the words of the contract when they are clear, explicit, and lead to no absurd consequences. LSA-C.C. art. 2046; Thomas v. Knight, 457 So.2d 1207, 1209 (La.App. 1st Cir.1984); Campesi v. Margaret Plantation, 417 So.2d 1265, 1267 (La.App. 1st Cir.), writ denied, 422 So.2d 163 (La.1982).
When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. LSA-C.C. art. 2046; Investors Associates Ltd. v. B.F. Trappey's Sons Inc., 500 So.2d 909, 912 (La.App. 3rd Cir.), writ denied, 502 So.2d 116 (La.1987); Kalmn, Inc. v. Walker Louisiana Properties, 488 So.2d 340, 343 (La.App. 3rd Cir.1986). Furthermore, the rules of interpretation establish that when a clause in a contract is clear and unambiguous, the letter of that clause should not be disregarded under the pretext of pursuing its spirit. LSA-C.C. art. 2046, comment (b); Cashio v. Shoriak, 481 So.2d 1013, 1015 (La. 1986).
The meaning and intent of the parties to the written contract in such cases must be sought within the four corners of the instrument and cannot be explained or contradicted by parol evidence. LSA-C.C. art. 1848; Tauzin v. Claitor, 417 So.2d 1304, 1309 (La.App. 1st Cir.), writ denied, 422 So.2d 423 (La.1982). Contracts, subject to interpretation from the instrument's four corners without the necessity of extrinsic evidence, are to be interpreted as a matter of law, and the use of extrinsic evidence is proper only where a contract is ambiguous after an examination of the four corners of the agreement. Investors Associates Ltd. v. B.F. Trappey's Sons Inc., 500 So.2d at 912. See Kemp v. Hudnall, 423 So.2d 1260, 1261 (La. App. 1st Cir.1982), writ denied, 428 So.2d 474 (La.1983); Wilson v. Cost + Plus of Vivian, Inc., 375 So.2d 683, 685 (La.App. 2nd Cir. 1979).
When the terms of a written contract are susceptible to more than one interpretation, or there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed, parol evidence is admissible to clarify the ambiguity or show the intention of the parties. Dixie Campers, Inc. v. Vesely Company, 398 So.2d 1087, 1089 (La.1981); Ayers v. Kent, 438 So.2d 691, 693 (La.App. 2nd Cir.1983). In cases in which the contract is ambiguous, the agreement shall be construed according to the intent of the parties. LSA-C.C. art. 2045. Intent is an issue of fact which is to be inferred from all of the surrounding circumstances. Kuswa & Associates, Inc. v. Thibaut Construction Co., Inc., 463 So.2d 1264, 1266 (La.1985); Commercial Bank & Trust Company v. Bank of Louisiana, 487 So.2d 655, 659 (La.App. 5th Cir. 1986). A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and other contracts of a like nature between the same parties. LSA-C.C. art. 2053; Allen v. Burnett, 530 So.2d 1294, 1301 (La.App. 2nd Cir.1988).
Whether a contract is ambiguous or not is a question of law. Myers v. Myers, 532 So.2d 490, 494 (La.App. 1st Cir.1988); *1206 Aycock v. Allied Enterprises, Inc., 517 So.2d 303, 309 (La.App. 1st Cir.1987), writs denied, 518 So.2d 512, 518 So.2d 513 (La.1988). Where factual findings are pertinent to the interpretation of a contract, those factual findings are not to be disturbed unless manifest error is shown. See G/O Enterprises, Inc. v. Mid Louisiana Gas Company, 444 So.2d at 1285; Universal Iron Works, Inc. v. Falgout Refrigeration, Inc., 419 So.2d 1272, 1274 (La.App. 1st Cir.1982). However, when appellate review is not premised upon any factual findings made at the trial level, but is, instead, based upon an independent review and examination of the contract on its face, the manifest error rule does not apply. Conoco, Inc. v. Tenneco, Inc., Tennessee Gas Pipeline Company, 524 So.2d 1305, 1312 (La. App. 3rd Cir.), writ denied, 525 So.2d 1048 (La.1988). In such cases, appellate review of questions of law is simply whether the trial court was legally correct.
Initially, MECO maintains that the words of the operating agreement are clear, explicit, and not ambiguous, as a matter of law. MECO submits that the trial court did not find a single clause of the agreement to be ambiguous. However, MECO contends that the trial court ignored the clear and explicit written terms of the agreement.
Under MECO's interpretation, the operating agreement, including the Contribution Clause, became effective as of January 1, 1980. The Contribution Clause in Article VIII of the operating agreement provided as follows:
C. Acreage or Cash Contributions:
While this agreement is in force, if any party contracts for a contribution of cash toward the drilling of a well or any other operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions said Drilling Parties shared the cost of drilling the well. If all parties hereto are Drilling Parties and accept such tender, such acreage shall become a part of the Contract Area and be governed by the provisions of this agreement. If less than all parties hereto are Drilling Parties and accept such tender, such acreage shall not become a part of the Contract Area. Each party shall promptly notify all other parties of all acreage or money contributions it may obtain in support of any well or any other operation on the Contract Area.
If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.
The Amoco/Gulf farmout agreement was executed on March 10, 1980, clearly after the January 1, 1980 effective date of the operating agreement. Thus, according to MECO, the Gulf farmout Agreement constitutes an acreage contribution that Amoco was obligated to share with MECO under the clear and explicit wording of the Contribution Clause of the operating agreement.
Amoco's interpretation of the operating agreement is somewhat different. Amoco submits that Exhibit "A", which is attached to the operating agreement, is determinant of the parties' "respective percentage or fractional interests under this Agreement," according to Article III.B of the operating agreement, which provided as follows:
B. Interest of Parties in Costs and Production:
Exhibit "A" lists all of the parties and their respective percentage or fractional interests under this agreement. Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and material acquired in operations on the Contract Area shall be owned by the parties as their interests are shown in Exhibit "A". All production of oil and gas from the Contract Area, subject to the payment of lessors's royalties shall also be owned by the parties in the same manner during the term hereof; provided, however, this shall not be deemed an assignment or cross-assignment of interest covered *1207 hereby. Said interest stipulated on Exhibit "A" are subject to revision upon completion of final unit survey.
Exhibit "A", attached to the Ravenswood Operating Agreement, provided, in pertinent part:

2. Percentage of Interest of Parties Under Agreement
 (Subject to revision upon completion of final unit
 survey.)
 Interest Interest
 Before Payout After Payout
 ------------- ------------
OperatorAmoco Production
Company .491 .339
Non-OperatorsMartin
Exploration Company .413 .413
 Chevron U.S.A., Inc. .096 .096
 Gulf Oil Corporation -0- .152

It is Amoco's position that Exhibit "A" clearly reflects that the Gulf farmout of the red acreage is fully owned by Amoco. According to Exhibit "A", Gulf owned no interest prior to payout.[4] Under the farmout agreement, Amoco had the right to all production from the Gulf acreage until payout. When, and if, Gulf "backs in" for a working interest after payout, Gulf's share would be deducted entirely from Amoco's interest. The interests of MECO and Chevron would not change, indicating that Amoco was the only party involved in the Gulf farmout.
MECO submits that the trial court concluded that a conflict existed regarding the application of the Contribution Clause and the interests set forth in Exhibit "A". The trial court stated, as follows:
Article VIII.C. states you shall participate; Exhibit "A" states you did not participate in this farmout on this occasion. Neither of the parties met that issue face to face at the time of execution or prior thereto, therefore, the Court believes that Exhibit "A", the typewritten insertion, should prevail over Article VIII.C., the stereotyped form.
MECO argues that this alleged conflict is controlled by Article II of the operating agreement, which stated:
[i]f any provision of any exhibit, except Exhibit "E", is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.
MECO also asserts that the express terms of Article III.B contemplated that the percentages listed in Exhibit "A" could be changed by operation of other contractual provisions, including the Contribution Clause.
After carefully reviewing the entire operating agreement, we find that the words of this agreement are clear, concise and unambiguous; therefore, parol evidence may not be considered.
The purpose of the Contribution Clause is to protect the participants of a joint operating agreement against the possibility that one of them might obtain an undue advantage from an outsider at the expense of those paying for the operations. Superior Oil Company v. Cox, 307 So.2d 350, 355 (La.1975). Exhibit "A" set forth the percentage of interests of each party under the agreement. Article III.B provided that all costs and liabilities incurred in operations under the agreement were borne and paid by the parties according to the interests as shown in Exhibit "A". Likewise, all production of oil and gas was owned by the parties in the same manner. Thus, without the Contribution Clause, when one of the participants in the operating agreement receives a contribution toward the operations from someone not a party to the agreement, the recipient of the contribution profits at the expense of his partners. See Superior Oil Company v. Cox, 307 So.2d at 356.
In the case at hand, regardless of the effective date of the operating agreement, Amoco obtains no undue advantage because the red acreage was clearly already a part of the contract area. This fact is clearly illustrated by the information contained in Exhibit "A". Gulf is listed as a non-operator, along with MECO and Chevron. Gulf would not be mentioned in the operating agreement had the red acreage not been included in the contract area. Additionally, the Ravenswood well was drilled on the red acreage. Amoco could not have drilled this well on the red acreage unless they had previously acquired the rights to that red acreage.
*1208 Also, Exhibit "A" reflects that the red acreage is already accounted for in Amoco's percentage of interest. Thus, Amoco is bearing the costs of the production of this well for its own acreage and for the red acreage acquired from Gulf through the farmout agreement. Thus, no undue advantage has been obtained by Amoco in this instance.
Therefore, we conclude that the trial court correctly determined that MECO was not entitled to share in the red acreage.

CONCLUSION
For the above reasons, the judgment of the trial court is affirmed. Appellants are cast for all costs.
AFFIRMED.
PARRO, J., concurs in the decree only.
NOTES
[1] A farmout agreement is a contract to assign oil and gas lease rights in acreage upon the completion of a drilling obligation and performance of the other provisions contained in the contract. Robinson v. North American Royalties, Inc., 509 So.2d 679, 681 (La.App. 3rd Cir.1987).
[2] Plaintiff's Exhibit No. 218 is a color-coded map reflecting the ownership of the acreage of the contract area. The record referred to the acreage involved in this case by color to signify the lease ownership of each party. The red acreage represented Gulf's leases; the blue acreage represented MECO's leases; the yellow acreage represented Amoco's leases; and the gray acreage represented Chevron's leases.
[3] MECO filed this suit; however, on July 16, 1982, MECO filed for protection under the U.S. Bankruptcy Code. On February 20, 1986, the U.S. Bankruptcy Court approved a "Settlement Stipulation" whereby Wells Fargo Bank, National Association (Wells Fargo) and/or its nominees would acquire all of MECO's assets. Wells Fargo subsequently acquired all of MECO's assets, including this cause of action. Wells Fargo Bank and ATC Realty Eight, Inc. were substituted as party plaintiffs in this cause of action on March 9, 1988. MECO will be used to refer to both Martin Exploration Company, and its successors, the appellants, Wells Fargo and ATC Realty Eight, Inc.
[4] The term "payout" refers to the date when the drilling costs have been recovered.